

Sandor Frankel (SF 8642)
Stuart E. Abrams (SA 6957)
M. Breeze McMennamin (MM 5141)
FRANKEL & ABRAMS
230 Park Avenue, Suite 660
New York, NY 10169
(212) 661-5000

**JUDGE SCHEINDLIN**

**10 CIV 6370**

Attorneys for Plaintiff
Ultra Records, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ULTRA RECORDS, INC., a New York
corporation,

                              Plaintiff,

        -against-

ULTRA ENTERPRISES, INC., a Florida
corporation, d/b/a Ultra Music Festival,

                              Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**VERIFIED**
**COMPLAINT**
(Jury Trial Demanded)

        Plaintiff, by its undersigned attorneys, as and for its Complaint, alleges as

follows:

### JURISDICTION AND VENUE

        1.      This is an action for breach of contract, for violation of the Lanham Act,

15 U.S.C. § 1114 and 1125, et seq., New York General Business Law §§ 349, 350, and

350-e, unfair competition, and unjust enrichment.  It seeks to enjoin and recover damages

for defendant's false and deceptive designation and advertisement of certain music

festivals using the names ULTRA or ULTRA MUSIC FESTIVAL (the "Offending

Festivals"), or any confusingly similar variation thereof.  Defendant has repeatedly used,

1

and threatens to use in the near future, plaintiff's name and trademark in connection with the Offending Festivals in a manner that breaches the explicit terms of the parties' written agreement, is misleading to consumers, and misappropriates plaintiff's trademarks, tradename, and goodwill. Defendant's conduct has resulted in a dilution of plaintiff's own trademarks and defendant's unjust enrichment at plaintiff's expense, and constitutes a breach of contract and unfair competition.

2.    This Court has jurisdiction of plaintiff's common law claims pursuant to 28 U.S.C. § 1332, based on the complete diversity of the parties and because the amount in controversy substantially exceeds $75,000.

3.    This Court has jurisdiction of plaintiff's Lanham Act claim pursuant to 28 U.S.C. § 1331. This court also has supplemental jurisdiction of the state law claims pursuant to 28 U.S.C. § 1367.

4.    Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in this District, and based on the forum-selection clause included in the parties' written agreement.

## PARTIES

5.    Plaintiff Ultra Records, Inc. ("URI") is a corporation organized and existing under the laws of the State of New York, and has its principal place of business in New York, New York. URI is engaged in the production, manufacture, and distribution of phonograph records, compact discs, music videos, and other sound recordings in various forms and configurations, and from time to time also organizes and sponsors live music festivals in New York.

6.      At all times relevant to this lawsuit, plaintiff URI has owned the ULTRA and ULTRA (Stylized) trademarks, attached as Exhibit 1 hereto, for use on and in connection with, *inter alia*, record label services and pre-recorded music (collectively, the "URI Trademarks"). URI is the owner of United States Trademark Registration Nos. 2,308,129 and 3,009,876 (the "Registrations") and numerous pending trademark applications for URI's ULTRA Trademarks.

7.      URI is one of the leading independent record companies in the world, and is the dominant independent music label in the genre of so-called "dance music." The strength of URI's "Ultra" tradename and trademarks has made URI essentially synonymous with the word "Ultra" in the dance music community.

8.      Defendant Ultra Enterprises, Inc., d/b/a Ultra Music Festival ("UMF") is, on information and belief, a corporation organized and existing under the laws of the State of Florida, and has its principal place of business in Miami, Florida.

9.      At all times relevant to this lawsuit, defendant UMF has done business as "Ultra Music Festival." On information and belief, UMF used the marks ULTRA MUSIC FESTIVAL, ULTRA BEACH PARTY, and the marks set forth on Exhibit 2 hereto, in connection with entertainment services, namely organizing and conducting music festivals and party events, and promoting dance music festivals for others (collectively, the "UMF Trademarks").

10.     On information and belief, UMF is the owner of United States Trademark Registration No. 2,892,744 for the mark ULTRA MUSIC FESTIVAL and Design.

11.     In 2003, URI filed an action against UMF in this court, entitled *Ultra Records, Inc. v. Ultra Enterprises, Inc. d/b/a Ultra Music Festivals, et al.*, 03 Civ. 5383

3

(S.D.N.Y.) (the "Prior Action"), charging UMF, among other entities, with trademark infringement and unfair competition based on its use of the name "Ultra" in connection with goods and services offered by UMF.

12.     URI settled the Prior Action with UMF pursuant to a written Settlement Agreement dated November 23, 2004, a copy of which is attached hereto as Exhibit 3 (the "Settlement Agreement").

13.     As part of the Settlement Agreement, UMF agreed to cease and desist from producing or marketing music CDs using the name "Ultra."   The Settlement Agreement (at ¶ 2) provides that UMF will not use any logo or other stylization that is confusingly similar to the URI Trademarks.

14.     Pursuant to the Settlement Agreement (at ¶ 3), UMF acknowledged "the validity, distinctiveness, and URI's ownership of URI's Trademarks for use in connection with record label services and pre-recorded music...."

15.     At the time the Settlement Agreement was negotiated and executed, UMF was operating only in Miami, Florida.  UMF had historically organized an annual live dance-music festival, in Florida, using the word "Ultra" in the promotion and marketing of that festival.  It was apparent to both UMF and URI that UMF's use of the term "Ultra" in connection with its Florida dance-music festivals was confusing to the public, who assumed URI was involved in those festivals.  For example, every year around the time of UMF's annual Florida festival, URI's President, Patrick Moxey, and several of URI's employees have been, and continue to be, approached for tickets, promotions, and other services and favors in connection with UMF's Florida festival by persons assuming they and URI are associated with it.

16.     In light of this manifest and ongoing public confusion, UMF agreed as part of the Settlement Agreement that it would not use the word "Ultra" in connection with live dance-music festivals that it might promote outside of Florida.  On information and belief, UMF knew and understood that if it used the word "Ultra" outside of Florida in connection with such events, it would be unfairly benefiting from the strength and reputation of, and confusion with, URI's "Ultra" name in the dance-music community – a name in which URI had invested millions of dollars over the years.

17.     Thus, UMF agreed (at Settlement Agreement  ¶ 8), that if it desired to promote or participate in a "commercial live event" outside the state of  Florida, using the word "Ultra" as part of the title or branding of such event, UMF would "do so exclusively" through a "New Entity" that would be formed, co-owned, and operated by URI and UMF.  The Settlement Agreement defines a "commercial live event" as "an event where the 'Ultra' entity (URI or UMF) receives income from the event itself, as opposed to a 'promotional' event which is held (from the point of view of the Ultra entity) solely to promote another product (e.g., a record) and where income is not derived by the Ultra entity from admission or similar charges to consumers."

18.     Pursuant to ¶ 8(b) of the Settlement Agreement, URI also agreed that if it promoted or participated in a commercial live event using the word "Ultra" as part of the title or branding of such event, URI would do so exclusively through the "New Entity."

19.     Pursuant to ¶ 8(c) of the Settlement Agreement, URI and UMF agreed  "to form, co-own and operate an entity (the 'New Entity') whose initial business shall be the production and promotion of commercial live events and large commercial live events."  The parties further agreed that "the form of the New Entity, and the terms of the

operating agreement (or shareholder or partnership agreement, as applicable) will be negotiated in good faith by the parties, it being the parties' intent that the costs to form and operate the New Entity, and the distributable proceeds derived from the New Entity, will be allocated equally between the parties."

20.     The parties agreed, in ¶ 8(c) of the Settlement Agreement, that the "New Entity will design and co-own one or more designations, brands, trademarks, and/or logos to be used exclusively in connection with the business activities of the New Entity."

21.     URI and UMF agreed that the Settlement Agreement, and all of the terms and conditions thereof, would "apply throughout the World." Settlement Agreement ¶ 12.

22.     Pursuant to the Settlement Agreement ¶ 22, URI and UMF agreed to "consent to exclusive personal jurisdiction in the Southern District of New York to enforce the terms of this agreement."

23.     Subsequent to the full execution of the Settlement Agreement, URI has repeatedly asked UMF to negotiate the terms of an operating agreement for the New Entity referred to in the Settlement Agreement, but UMF has been largely unresponsive to URI's repeated requests in this regard.

24.     URI prepared the first draft of such an operating agreement in May, 2005, and repeatedly requested that UMF provide comments on said draft and otherwise take steps to finalize the operating agreement. After a conference call between the parties in June, 2008, URI sent UMF a revised operating agreement on June 26, 2008, but never received any further communication from UMF on the revised agreement, despite repeated requests for comments by URI.

25.     On information and belief, subsequent to the full execution of the Settlement Agreement, UMF has promoted and/or participated in at least four (4) commercial live events, that were held outside of Florida, using the word "Ultra" as part of the title or branding of such events, but did not do so through the "New Entity," as required by the Settlement Agreement.

26.     In addition, on information and belief, UMF is currently in the process of promoting, marketing, and soliciting talent for at least three additional commercial live events, scheduled to be held in Spain and Brazil in August, October, and November of 2010.  UMF has repeatedly used the word "Ultra" as part of the title and/or branding of these events, and has made no effort to form the New Entity or involve the New Entity in these upcoming music festivals.

27.     Counsel for URI wrote to UMF on January 4, 2010 (the "January 4, 2010 Letter") notifying UMF that it had breached the Settlement Agreement by repeatedly using the word "Ultra" in connection with the marketing and promotion of commercial live events outside of Florida subsequent to the execution of the Settlement Agreement without involving the New Entity.  That letter stated that "UMF has promoted one or more commercial live events outside of Florida using the word 'Ultra' as part of the branding of such events.  As these activities were not undertaken with URI through the New Entity, the same constitute a material breach of UMF's obligations under the [Settlement] Agreement."  *See* Exhibit 4 hereto.

28.     The January 4, 2010 Letter also notified UMF that it had further breached the Settlement Agreement by failing to "finalize the operating agreement for the New Entity and to work with UMF to build the live events business contemplated by the

[Settlement] Agreement.  UMF never responded to the January 4, 2010 Letter, has been
unresponsive to URI's efforts to form the New Entity, and, based on UMF's recent
activities, URI suspects that UMF intends to ignore its obligations under the Agreement.
URI remains ready and willing to work with UMF, but will vigorously enforce its rights
if UMF continues to violate the terms of the Agreement."

        29.    At the same time that UMF has continued to use the word "Ultra" in
connection with its music festivals in breach of the Settlement Agreement, it has
simultaneously used its stylized logos that do not explicitly use the term "Ultra," in an
apparent effort to establish a link in the public's mind between UMF's stylized logos that
do not use the term "Ultra" with URI's trademarked "Ultra" name and logo so that, as
time goes by, the public will automatically associate UMF's stylized logos with URI's
"Ultra" name and reputation.

        30.    To the extent the public equates UMF's stylized logo with URI's "Ultra"
name and reputation -- which phenomenon has been accomplished by UMF's blatant and
continuing violations of the Agreement -- UMF's brand will have further benefited from
UMF's wrongful misappropriation of the "Ultra" name by having transferred the strength
of the "Ultra" name to UMF's stylized logo, with the result that UMF will no longer need
to market its music festivals using the word "Ultra," but only its stylized logo.  Thus,
UMF is positioning itself to be able to successfully promote its commercial live events in
a manner that arguably would not be in technical breach of the Settlement Agreement,
but without involving the New Entity as required by the Settlement Agreement.

31.     In so doing, UMF has systematically misappropriated the goodwill and reputation that URI has established for its name and trademarks, without compensating URI.

32.     Thus, while URI has continuously adhered to the terms of the Settlement Agreement since its execution, UMF has flagrantly continued to breach the Settlement Agreement by promoting its music festivals and commercial live events using the word "Ultra" but not involving the New Entity, in breach of the Agreement and in violation of the Lanham Act and common law.

## FIRST CLAIM FOR RELIEF
(Breach of Contract)

33.     Plaintiff URI repeats and realleges all allegations of paragraphs 1 through 32, above, as if explicitly incorporated herein.

34.     Defendant UMF's conduct, as described above, in failing to work with URI to create the New Entity constitutes a material breach of the Settlement Agreement.

35.     Defendant UMF's conduct in continuing, after execution of the Settlement Agreement, to market, promote, and participate in the Offending Festivals outside the State of Florida using the word "Ultra" as part of the title, marketing, and branding of such events, without involving the "New Entity" (as defined in the Settlement Agreement), constitutes a material breach by UMF of the Settlement Agreement.

36.     URI has performed all of its obligations under the Settlement Agreement.

37.     Defendant UMF's actions in breach of the Operating Agreement have caused substantial damages to URI, in an amount to be determined at the trial of this action, but believed to be in excess of $75,000, exclusive of interest and costs.

38.     In addition, UMF's continuing breaches of contract are causing, and are likely to continue to cause substantial injury and damage to plaintiff for which there is no adequate remedy at law, and plaintiff is entitled to injunctive relief under common law.

**SECOND CLAIM FOR RELIEF**
(Registered Trademark Infringement – Violation of
Section 32 of the Lanham Act)

39.     Plaintiff repeats and re-alleges all allegations of paragraphs 1 through 38, above, as if explicitly incorporated herein.

40.     Plaintiff has used the trademarks as shown in the Registrations in interstate commerce continuously since the dates of first use set forth in the Registrations.

41.     Plaintiff's use of the Trademarks has been open, notorious, and continuous.

42.     The Trademarks, as applied to the goods identified in the Registrations, are inherently distinctive and strong trademarks.

43.     Because of Plaintiff's long, exclusive and extensive use and promotions of the Trademarks, the Trademarks have become distinctive and famous, and indicate a single source of origin of Plaintiff's goods and services.

44.     The Registrations are valid and subsisting.

45.     Upon information and belief, Defendant has used Plaintiff's Trademarks and or marks confusing similar thereto in a manner not specifically permitted under the Settlement Agreement and thus, such use has been without Plaintiff's permission or consent.

46.     Upon information and belief, the aforementioned acts of Defendant have caused and are likely to cause confusion, mistake, and deception.

47.     The foregoing acts of Defendant constitute infringement of Plaintiff's Trademarks and Registrations.

48.     Upon information and belief, Defendant's acts of trademark infringement have been willful, deliberate, and intentional.

49.     Upon information and belief, Defendant used Plaintiff's Trademarks without Plaintiff's authorization or consent with the intent to deceive consumers and to cause confusion among purchasers, for the purpose of benefiting from the good will and public recognition associated with Plaintiff's Trademarks and diverting sales from Plaintiff to Defendant.

50.     Upon information and belief, the aforementioned acts of Defendant have caused and will continue to cause actual confusion and a likelihood of confusion in the minds of the trade and the public, and will damage Plaintiff's reputation for exclusivity in connection with the Trademarks.

51.     Upon information and belief, by virtue of Defendant's conduct, Defendant has used and intends to continue to use spurious marks in connection with trafficking in the sale and distribution of the goods and services in interstate commerce, which marks are identified with Plaintiff's Trademarks, which are federally registered trademarks in the United States Patent and Trademark Office.

52.     Upon information and belief, Defendant's conduct has been willful and malicious and Defendant will continue its acts of willful infringement unless enjoined by this Court.

53.     Upon information and belief, by virtue of Defendant's conduct, Defendant has engaged in infringement of Plaintiff's federally registered trademarks, in violation of

the Lanham Act, 15 U.S.C. § 1114(1), by using a mark wherein such use is likely to cause confusion, or to cause mistake, or to deceive.  Upon information and belief, Defendant's infringing acts taking place outside of the U.S. have had a significant impact on U.S. commerce.

54.     Upon information and belief, Defendant has made unlawful gains and profits from such unlawful infringements and, by reason thereof, Plaintiff has been deprived of rights and profits which otherwise would have come to Plaintiff, but for such infringements.

55.     Plaintiff has no adequate remedy at law for the injury alleged in this Count.  The injury is intangible in nature and not capable of being fully measured or valued in terms of monetary damages.  Further, the injury is of a continuing nature and will continue to be suffered so long as Defendant continues its wrongful conduct.

56.     Notwithstanding the inadequacy of and the difficulty of presently fully ascertaining Plaintiff's monetary damages caused by Defendant's wrongful conduct, Plaintiff is informed and believes and, based upon such information and belief, alleges that said conduct has resulted in irreparable, direct and proximate damages to Plaintiff.

57.     Plaintiff seeks leave of this Court to amend the complaint to allege the full nature and extent of said monetary damages if, when and to the extent the damages are ascertained.

### THIRD CLAIM FOR RELIEF

(Common Law Infringement and Unfair Competition - Violation of Section 43 (a) of the Lanham Act)

58.     Plaintiff repeats and realleges all allegations of paragraphs 1 through 57, above, as if explicitly incorporated herein.

59.     UMF's actions described above constitute common law trademark infringement, false designation, and a false description of URI's involvement in and relationship with the Offending Festivals, and unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125.  UMF has misappropriated URI's name and trademarks in connection with the Offending Festivals without authorization or license from plaintiff. As a result of UMF's unlawful conduct, described herein, plaintiff has sustained, and if UMF is not enjoined, will continue to sustain irreparable injury.

60.     UMF's false and misleading representation in its marketing, promotional, and branding materials for the Offending Festivals has deceived, and will continue to deceive consumers.

61.     UMF's music festivals, including the Offending Festivals, are advertised and tickets to them are available for sale in several states, including through internet sales, and are therefore in interstate commerce.

62.     UMF's conduct, as described above, is causing, and is likely to cause, substantial injury and damage to plaintiff for which there is no adequate remedy at law, and plaintiff is entitled to injunctive relief.

## FOURTH CLAIM FOR RELIEF
(Violation of New York's Deceptive Trade Practices Act)

63.     Plaintiff repeats and realleges all allegations of paragraphs 1 through 62, above, as if explicitly incorporated herein.

64.     UMF's promotion, marketing, and advertising of the Offending Festivals is false and misleading with respect to URI's involvement thereon, and is directed at the general public and consumers, including those within the State of New York.

65.     On information and belief, tickets to the Offending Festivals have been, and continue to be sold and marketed within the State of New York, via the Internet and through other channels.

66.     UMF's repeated use of the word "Ultra" in connection with its promotion, marketing, and branding of the Offending Festivals, without involving URI or the New Entity, intentionally, deliberately, willfully, or knowingly deceives the public and consumers, confuses and or is likely to confuse the public and consumers, and materially misleads consumers as to the quality, source, and sponsorship of the Offending Festivals.

67.     Consumers have reasonably relied and/or are likely to reasonably rely on the improper references to URI's "Ultra" name in connection with the Offending Festivals in making ticket-purchase decisions, and have been injured and damaged and are likely to be further injured and damaged by UMF's statements and actions described hereinabove in violation of New York General Business Law §§ 349(a).

68.     UMF's statements and actions with respect to the Offending Festivals as described hereinabove have injured and damaged, and will likely further injure and damage plaintiff in violation of New York General Business Law §§ 349(a).

69.     UMF's statements and actions with respect to the Offending Festivals as described hereinabove entitle plaintiff to the damages, reasonable attorneys' fees, and injunctive relief available under New York General Business Law § 349(h).

### FIFTH CLAIM FOR RELIEF
(Violation of New York's False Advertising Statute)

70.     Plaintiff repeats and realleges all allegations of paragraphs 1 through 69, above, as if explicitly incorporated herein.

71.     UMF's promotion, marketing, and advertising of the Offending Festivals using the "Ultra" name in violation of the Settlement Agreement is misleading and deceptive insofar as it describes the Offending Festivals as being affiliated and organized by URI, and is directed at the general public and consumers, including those within the State of New York.

72.     UMF's Offending Festivals have been, and continue to be, advertised and marketed within the State of New York.

73.     UMF's references to "Ultra" in connection with the Offending Festivals, in breach of the Settlement Agreement, intentionally, deliberately, willfully, or knowingly deceives the public and consumers, confuses and or is likely to confuse the public and consumers, and materially misleads consumers as to the nature, characteristics, and/or content of the Offending Festivals.

74.     Consumers have reasonably relied and/or are likely to reasonably rely on UMF's misrepresentations regarding URI's affiliation with the Offending Festivals in making ticket purchasing decisions, and have been injured and damaged and are likely to be further injured and damaged by UMF's statements and actions described hereinabove in violation of New York General Business Law §§ 350 and 350-a.

75.     UMF's statements and actions with respect to the Offending Festivals as described hereinabove have injured and damaged and will likely further injure and damage plaintiff in violation of New York General Business Law 350 and 350-a.

76.     UMF's statements and actions with respect to the Offending Festivals as described hereinabove entitle plaintiff to increased damages, reasonable attorneys' fees, and injunctive relief under New York General Business Law § 350-e.

## SIXTH CLAIM FOR RELIEF
(Violation of Common Law)

77.     Plaintiff repeats and realleges all allegations of paragraphs 1 through 76, above, as if explicitly incorporated herein.

78.     UMF's conduct as described herein constitutes false advertising, unfair competition, and unfair business practices under the common law.

79.     UMF's actions demonstrate an intentional, willful, and bad-faith intent to harm plaintiff's business, the goodwill and reputation of plaintiff's business franchise.

80.     UMF is causing, and is likely to cause, substantial injury and damage to plaintiff for which there is no adequate remedy at law, and plaintiff is entitled to injunctive relief under common law.

81.     Plaintiff is also entitled to recover UMF's profits, and plaintiff's actual damages, costs, and attorneys' fees under common law.

WHEREFORE, plaintiff demands judgment against defendant as follows:

1.     A preliminary injunction directing UMF to:

(a)     cease and desist from the marketing, promotion, advertising, and branding of the Offending Festivals using the word "Ultra" without involving the New Entity, in violation of the Settlement Agreement and plaintiff's rights thereunder, as described above;

(b)     cease and desist from using any of the marks included in Exhibit 2 to the Complaint in its marketing, promotion, advertising, and branding of the Offending Festivals without involving the New Entity, pursuant to the "safe distance rule;"

(c)     immediately destroy or cause to be destroyed all copies of marketing and promotional materials for the Offending Festivals that are violative of plaintiff's rights as described above, and provide proof of such destruction to plaintiff; and

(d)     to account to plaintiff with respect to UMF's revenues and profits from the Offending Festivals and from the sale of any and all CDs or other ancillary products related to the Offending Festivals.

2.     Judgment awarding plaintiff the damages recoverable under 15 U.S.C. § 1117, including the actual damages suffered by plaintiff as a result of the above-described violations of the Lanham Act, N.Y. General Business Law §§ 349, 350, and 350-a, together with any additional profits of defendant, and treble damages;

3.     Judgment awarding plaintiff exemplary damages as appropriate to punish for past willful conduct and to deter future willful conduct;

4.     Judgment awarding plaintiff its attorneys fees;

5     A mandatory injunction, perpetually restraining and enjoining the defendant, its officers, deputies, agents, employees, representatives, and other persons in concert or participation, from using URI's Trademarks, the word "Ultra", the UMF mark, any mark falling within a "safe distance" of any of URI's Trademarks, or any other mark which is confusingly similar to URI's Trademarks or which is in any manner violative of plaintiff's exclusive contractual, statutory, or common law rights;

6     An accounting of the amounts earned by UMF from the Offending Festivals and from the sale of any and all CDs or other ancillary products related to the Offending Festivals; and

17

7.      Such other, further, and different relief as to the Court may seem just and

proper, including plaintiff's costs and reasonable attorney's fees.

**PLAINTIFF DEMANDS TRIAL BY JURY OF ALL LEGAL CLAIMS.**

Dated:  New York, NY
        August 25, 2010

                                    FRANKEL & ABRAMS

                                    By: _____
                                    Sandor Frankel (SF 8642)
                                    Stuart E. Abrams (SA 6957)
                                    M. Breeze McMennamin (MM 5141)
                                    230 Park Avenue
                                    New York, NY  10169
                                    (212) 661-5000

                                    Attorneys for Plaintiff
                                    Ultra Records, Inc.

# VERIFICATION

STATE OF NEW YORK      )
                       ) ss.:
COUNTY OF NEW YORK     )

I, the undersigned, being duly sworn, depose and say: I am President of the plaintiff corporation in the action; I have read the foregoing Verified Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters, I believe it to be true.

_____
Patrick Moxey

Sworn to before me this
24th day of August, 2010

_____
NOTARY PUBLIC

DESEAN A MORGAN
Notary Public - State of New York
NO. 01MO6194081
Qualified in Kings County
My Commission Expires 9/09/10

**COMPLAINT**

**EXHIBIT 1**



12

**COMPLAINT**

**EXHIBIT 2**





ULTRA MUSIC FESTIVAL

UMF

ULTRAMUSICFESTIVAL.US

11

Initials: _____ / _____

**COMPLAINT**

**EXHIBIT 3**

## SETTLEMENT AGREEMENT

This Agreement is made and entered into this 23rd day of November, 2004 (the "Effective Date"), by and between **Ultra Records, Inc.,** ("URI") a corporation organized and existing under the laws of the State of New York, with its principal place of business in New York, New York and **Ultra Enterprises, Inc.** ("UEI"), which sometimes does business as the Ultra Music Festival, a corporation organized and existing under the laws of the State of Florida, with a place of business in Miami, Florida, together with all of UEI's principals, affiliates, and predecessors in interest (all collectively "UMF").

**WHEREAS,** URI is the owner of the ULTRA and the ULTRA (Stylized) trademarks, attached as Exhibit B, for use on and in connection with, inter alia, record label services and pre-recorded music (collectively, "URI's Trademarks");

**WHEREAS,** URI is the owner of pending United States Trademark Application Serial No. 76-297102 for URI's ULTRA Trademark ("URI's Application");

**WHEREAS,** UMF is the owner of the mark ULTRA MUSIC FESTIVAL and ULTRA BEACH PARTY and the marks set forth as Exhibit A, in connection with entertainment services, namely organizing and conducting music festivals and party events and promoting music festivals for others (collectively referred to as "UMF's Trademarks");

**WHEREAS,** UMF is the owner of pending United States Trademark Registration No 2,892,744 for the mark ULTRA MUSIC FESTIVAL and Design ("UMF's Registration");

**WHEREAS,** in or about July of 2003, UMF, working together with Thrive Records ("Thrive"), Sony Music Entertainment Inc. ("Sony"), Red Music Distribution ("Red") and others, produced, distributed, and sold compact discs titled "ULTRAMUSICFESTIVAL:01" (the "Disc");

Initials: _NA_ / _R_

WHEREAS, URI objected to UMF's use of the ULTRA designation in connection with compact discs and has accused UEI of trademark infringement;

WHEREAS, URI filed an action in the United States District Court for the Southern District of New York, Civil Action No. 03 Civ. 5383, charging UMF, Thrive, Sony, Red, and James Davis with trademark infringement and unfair competition (the "Action"), which Action is currently pending;

WHEREAS, URI settled its dispute with Sony, Red and Thrive;

WHEREAS, URI dismissed Sony and Red from the Action;

WHEREAS, URI has settled its claims against Thrive pursuant to express agreement and court order;

WHEREAS, the parties hereto wish to compromise and settle their dispute and the Action.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.      UMF shall immediately cease offering and shall not thereafter (subject to the terms of this Agreement) offer for sale, selling, advertising, promoting, sponsoring, and/or distributing, pre-recorded music and/or video fixed in a tangible form of expression, including but not limited to compact discs (CD's), digital video discs (DVD's) and down-loads via the Internet, (the "Products") titled ULTRA or ULTRA MUSIC FESTIVAL, or any confusingly similar variation thereof.

2.      UMF shall not use any logo or other stylization that is confusingly similar to the URI Trademarks, as set forth as Exhibit B.  URI acknowledges that, to the extent used in a manner consistent with this Agreement, the marks set forth in Exhibit A are not confusingly

Initials: _RA / PM_

2

similar to the URI Trademarks.

3.      UMF acknowledges the validity, distinctiveness, and URI's ownership of URI's Trademarks for use in connection with record label services and pre-recorded music, subject to the terms of this agreement. UMF shall not contest or challenge, nor aid any other person or entity in so contesting or challenging, the validity, distinctiveness, or URI's ownership of URI's Trademarks. By way of example, and without limiting the forgoing, UMF shall not oppose URI's Application or seek cancellation of any trademark registration maturing therefrom.

4.      Without limiting any of the terms of this Agreement, URI acknowledges the validity, distinctiveness, and UMF's ownership of UMF's Trademarks for use in connection with entertainment services, namely organizing and conducting music festivals and party events and promoting music festivals for others, subject to the terms of this agreement. URI shall not contest or challenge, nor aid any other person or entity in so contesting or challenging, the validity, distinctiveness, or UMF's ownership of UMF's Trademarks. By way of example, and without limiting the forgoing, URI shall not petition to cancel UMF's Registration.

5.      As used in this Agreement, a "commercial live event" refers to an event where the "Ultra" entity (URI or UMF) receives income from the event itself, as opposed to a "promotional" event which is held (from the point of view of the Ultra entity) solely to promote another product (e.g., a record) and where income is not derived by the Ultra entity from admission or similar charges to consumers.

6.      As used in this Agreement, a "large commercial live event" means a commercial live event (i) featuring more than three (3) separate musical artists or acts; and (ii) of a duration of five (5) hours or more; and (iii) open to an audience of five thousand (5,000) people or more.

7.      Intentionally Deleted.

3

Initials: _NA./Ph_

8.    (a)    If UMF desires to promote or participate in one or more commercial live events outside of Florida (including large commercial live events) using the word "Ultra" as part of the title or branding of such event(s), then UMF shall do so exclusively through the "New Entity", as defined below.

(b)    If URI desires to promote or participate in one or more commercial live events (including large commercial live events) using the word "Ultra" as part of the title or branding of such event(s), then URI shall do so exclusively through the "New Entity", as defined below.

(c)    URI and UMF agree to form, co-own and operate an entity (the "New Entity") whose initial business shall be the production and promotion of commercial live events and large commercial live events. The form of the New Entity, and the terms of the operating agreement (or shareholder or partnership agreement, as applicable) will be negotiated in good faith by the parties, it being the parties' intent that the costs to form and operate the New Entity, and the distributable proceeds derived from the New Entity, will be allocated equally between the parties. The New Entity will design and co-own one or more designations, brands, trademarks and/or logos to be used exclusively in connection with the business activities of the New Entity.

(d)    Upon the adoption by the New Entity of any brand, mark, or other designation as contemplated by this Agreement, the parties shall prepare, execute and file, and cooperate with each other in the preparation, execution and filing, any and all documents necessary to facilitate the adoption, use, and ownership of such brand, mark or designation by the New Entity, including, without limitation, consents for use and registration on behalf of UMF and URI, and trademark searches, opinions, and/or applications for registration.

4

Initials: _NF ./ Pm_

9.      With respect to UMF's annual "Ultra Music Festival" in Miami, URI shall be entitled to a gratis "premium sponsorship" (as that term is currently used by UMF in connection with the annual Ultra Music Festival) package with respect to the relevant event(s).

10.     (a)      Without limiting any other terms of this Agreement, the parties agree that URI shall have and is hereby granted the exclusive worldwide right to manufacture, distribute, market and sell an annual "Ultra Music Festival" branded full length phonograph record album, in all configurations (the "Albums"). The track listing, artwork, marketing plan and release dates (subject to Ultra's distributors' practices) for the Albums will be mutually designated by URI and UMF. URI will obtain clearances for the master recordings to be embodied on the Albums, and will pay the royalties associated therewith. URI shall pay to UMF a basic royalty of three percent (3%) of the dealer price for net sales of the Albums through normal retail channels in the United States, to be calculated in accordance with the provisions set forth in Exhibit C. In the event that URI licenses an Album to a third party and receives an advance therefor, URI shall pay to UMF one-sixth (1/6) of such advance, which amount shall constitute an advance against royalties otherwise payable to UMF by URI in connection with that third party license. The financial terms set forth in this paragraph 10(a) with respect to the release of Albums shall apply with respect to the Album for the calendar year 2005. For subsequent Albums, the parties agree to revisit and renegotiate such financial terms in good faith, with due regard for industry standards for arrangements of this type.

(b)      The parties agree that, commencing with calendar year 2005, URI shall have and is hereby granted the exclusive worldwide right to manufacture, distribute, market and sell an annual "Ultra Music Festival" branded DVD (including footage from the annual Ultra Music Festival(s), interviews, musical performances, etc.) (the "Event DVDs"). The Event

Initials: _NA_ / _Pm_

5

DVDs will be produced by UMF and its designees, in consultation with URI.  UMF will obtain clearances for all rights required for URI to release each Event DVD, and will provide to URI documentary evidence of such clearances upon URI's request.  URI will pay all approved third party royalties pursuant to clearances obtained by UMF in connection with the Event DVDs, and UMF warrants that such clearances will be on arms-length, industry standard terms.  After deduction of all actual third party costs incurred by URI in connection with the manufacture, distribution, sale and marketing of each Event DVD (including but not limited to third party royalties), URI will pay to UMF forty percent (40%) of the profit derived by URI from the Event DVDs.  Without limiting the foregoing, the parties acknowledge that UMF has independently released a DVD from the 2004 Ultra Music Festival, that such DVD is titled and branded using the designation "UMF" and not using the word "Ultra", and URI confirms that the packaging of such DVD is not objectionable to URI.

(c)     URI agrees that it will evaluate and inform UMF of its intention to release each successive Album and Event DVD hereunder (i) in the case of Albums, on or about the date which is four (4) months following the initial commercial release by URI in the United States of the immediately preceding Album; and (ii) in the case of Event DVDs, on or about the date which is four (4) months following the conclusion of the annual Ultra Music Festival in Miami each year.

(d)     URI will account and pay royalties due to UMF pursuant to subparagraphs 10(a) and 10(b) above on a semi-annual basis, within 90 days after the close of the applicable semi-annual accounting period (currently June 30 and December 31).  All statements shall be binding and not subject to objection unless objected to within two (2) years after the date rendered by URI.  UMF may inspect URI's books and records relating to exploitation of the

Initials: _U.A._ / _Pm_

Albums and Event DVDs only during normal business hours and only upon reasonable written notice.  URI's books and records relating to a particular statement or other accounting may be examined only once per year, only once with respect to any particular statement, and only within two (2) years after the date that the applicable statement(s) or accounting(s) are rendered.  No action, suit or proceeding regarding any statement or accounting rendered by URI may be maintained unless commenced in a court of competent jurisdiction within two (2) years after the date that statement or accounting is due.

(e)      UMF agrees that, in addition to URI's rights with respect to the Albums and Event DVDs and without limiting any of the other provisions hereof, URI will have the exclusive first right, on the terms set forth above, to release any additional audio and/or audiovisual products UMF may wish to release using the word "Ultra" as part of the title or branding of such products.  If URI declines to release a particular audio or audiovisual product (including any Album or Event DVD), UMF may do so independently, but UMF warrants that such product(s) will not utilize the word "Ultra" (including but not limited to "Ultra Music Festival") as part of the title or branding of such product(s), nor on the related artwork or advertising therefor (although the phrase "Ultra Music Festival" may appear in the inside booklet of such product(s) solely as part of descriptive text or liner notes).  URI acknowledges that the DVD released by UMF in respect of the 2004 Ultra Music Festival, titled "The UMF Experience 2004" and the Disc (but specifically excepting the outside front, back and spine packaging of the Disc) conforms to the terms and conditions set forth in this paragraph.  As used in this subparagraph, "audio and/or audiovisual products" does not refer to ephemeral broadcasts or transmissions of the relevant content (e.g., a pay per view program or a television broadcast), but does include all physical embodiments of such content (including but not limited to compact

7

Initials: _NA_ / _Pn_

discs and DVDs), as well as digital transmissions thereof to the extent the consumer can make a permanent copy of such transmission (e.g., a download).

11.     UMF shall use its best commercial efforts to secure the termination of its purported license agreement with James Davis or his affiliates ("James Davis").

12.     This Agreement, and all of the terms and conditions herein, shall apply throughout the World.

13.     URI hereby fully and completely releases UMF, its directors, officers, employees, agents, attorneys, suppliers and customers, any additional distributors or re-sellers in the chain of distribution and ultimate consumers, all of whom shall be deemed third party beneficiaries of this Agreement, from any liability or claim of any nature whatsoever, known or unknown, from the beginning of time to the date of this Agreement, pertaining to or arising from any and all claims, damages, defenses, counterclaims, and causes of actions asserted in the Action, which could have been asserted in the Action, or which otherwise relate to or arise out of UMF's use of UMF's Trademarks, ULTRA or ULTRA MUSIC FESTIVAL.

14.     URI's release and discharge as contained herein is not, and shall not be construed as a license, explicit or implied, for UMF's past use of any ULTRA trademark.

15.     UMF hereby fully and completely releases URI, its directors, officers, employees, agents, attorneys, suppliers and customers, any additional distributors or re-sellers in the chain of distribution and ultimate consumers, all of whom shall be deemed third party beneficiaries of this Agreement, from any liability or claim of any nature whatsoever, known or unknown, from the beginning of time to the date of this Agreement, pertaining to or arising from any and all claims, damages, defenses, counterclaims, and causes of actions asserted in the Action, which could have been asserted in the Action, or which otherwise relate to or arise out of URI's use of URI's

Initials: _____/_____

Trademarks.

16.     The parties shall file a Stipulation of Dismissal pursuant to Rule 41(a)(1)(ii) of the Federal Rules of Civil Procedure dismissing UMF from the Action with prejudice.

17.     No modification, or cancellation of any term, condition or obligation, of this Agreement shall be effective unless in writing and signed by the parties to this Agreement.

18.     No breach or omission of any term, condition or obligation shall be deemed waived unless so waived in writing. No waiver shall be deemed a waiver of, nor excuse the performance of any term, condition or obligation not specifically set forth in the written waiver. Neither party shall be deemed to be in breach of its obligations hereunder unless the party alleging breach shall serve specific written notice upon the other party and such party shall have failed to cure the circumstance giving rise to an allegation of breach within thirty (30) days following its receipt of such written notice.

19.     This agreement shall inure to the benefit of, and be binding upon the parties and their respective successors, heirs, and assigns.

20.     This Agreement represents the entire and only agreement among the parties relating to the subject matter hereof. Any representation, promise or condition not incorporated herein shall not be binding upon the parties.

21.     This Agreement shall be interpreted, construed, and governed by the laws of the State of New York, without giving effect to the principles of conflicts or choice of law.

22.     The parties consent to exclusive personal jurisdiction in the Southern District of New York to enforce the terms of this agreement.

23.     This agreement may be executed in one or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

9

Initials: _n.A. / Pm_

24.    Each party to the Action shall bear its own attorney fees and costs in connection with the Action, the drafting of this Agreement, and all other legal fees in connection with this matter.

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement as of the dates set forth.

**ULTRA RECORDS, INC.**

By: _____

Name: _Patrick Moxey_

Title: _President_

Date: _Jun 6 2005_

**ULTRA ENTERPRISES, INC.**

By: _____

Name: _____

Title: _____

Date: _____

10

Initials: _____

**Exhibit A**





ULTRA MUSIC FESTIVAL

UMF

ULTRAMUSICFESTIVAL.US

11

Initials: _____

Exhibit B



Initials: _____

Exhibit C

(a)   (i)   A royalty equal to eighty percent (80%) of the royalty rate referred to above, for all top-line, full priced Albums delivered to URI hereunder, which records are sold by URI through normal retail channels in Canada, the United Kingdom or Germany, and not returned.

(ii)   A royalty equal to sixty percent (60%) of the royalty rate referred to above, for all top-line, full priced Albums delivered to URI hereunder, which records are sold by URI through normal retail channels outside of the United States and Canada and not returned.

(b)   A royalty of fifty percent (50%) of URI's net royalty receipts, for all records sold pursuant to third party licensing arrangements, multiplied by a fraction (the "Fraction"), the numerator of which is UMF's royalty for the applicable record, and the denominator of which is the combined record royalties payable by URI to all royalty participants on the applicable record (including artists, producers, UMF, and all third party licensors). For the avoidance of doubt, where records embodying the Masters are commercially downloaded via third party "retailers" (e.g. "iTunes"), such sales shall be deemed normal retail channel sales hereunder.

(c)   As to records embodying the Masters which are sold through record clubs or similar sales plans or devices, UMF shall be credited with fifty percent (50%) of URI's net royalty receipts from such sales, multiplied by the Fraction.

(d)   With respect to any record sold which embodies Masters hereunder coupled with other master recordings, the royalty rate shall be that proportion of the otherwise applicable royalty rate that the number of Masters recorded or acquired hereunder and embodied on such record bears to the total number of master recordings (including Masters) embodied on such record(s).

(e)   In the event URI licenses Masters delivered hereunder for phonograph record use in connection with any third party compilation album or in connection with any so-called "soundtrack album" or records derived therefrom or in connection with any use or exploitation of Masters not specifically provided for herein, then, in lieu of any other payment due under this agreement, URI shall credit UMF's royalty account with fifty percent (50%) of URI's net royalty receipts in connection with the applicable record or use, multiplied by the Fraction.

(f)   Royalties on phonograph records included in albums, jackets, boxes or any other type of package or container (herein collectively referred to as "containers") shall be based solely upon the dealer price of such phonograph records in containers less all taxes and duties and also less the following container charges: twelve percent (12%) of the dealer price for a single-fold vinyl disc record in a standard no-picture sleeve with no inserts; twenty percent (20%) of the dealer price for analog tape formats; and twenty percent (20%) of the dealer price for compact discs, vinyl records with artwork and any other record other than expressly provided for in this paragraph or any non-disc configuration (e.g., records sold in a New Technology format).

(g)   Deleted.

(h)   In computing the number of records sold hereunder, URI shall have the right to deduct returns and credits of any nature, including without limitation, (i) those on account of any return or exchange privilege, (ii) defective merchandise, and (iii) errors in billing or shipment. URI shall have the right to withhold a reasonable portion of royalties as a reserve, not to exceed 33% of net sales in respect

13

Initials: _[signature]_

of the accounting period for which the reserve is taken, with each such reserve to be liquidated within four (4) accounting periods following the taking thereof.

      (i)     Deleted.

      (j)     URI shall have the right to sell records and otherwise exploit the Album and Masters derived therefrom under any distribution or merchandising arrangements it may deem desirable. No royalties shall be payable in respect of (i) records given away or furnished on a "no-charge" basis to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with URI (which records shall be deemed to be 10% of records shipped hereunder, it being understood that such no charge records shall be inclusive of all standard distributor discounts); (ii) such additional "no-charge" records distributed during short term special promotions or marketing campaigns, limited to an additional 10% of records shipped during the applicable accounting period; (iii) records given away or sold at below stated wholesale prices for promotional purposes to disc jockeys, record reviewers, radio and television stations and networks, motion picture companies, music publishers, URI's employees, UMF or other customary recipients of promotional records or for use on transportation facilities; (iv) records sold as scrap, salvage, overstock or "cut-outs"; (v) records sold below cost; and (vi) "sampler" records intended for free distribution to automobile purchasers.

      (k)     (i)     For the sale of records by third parties which include Masters subject hereto which are sold through the method known as "key outlet marketing" by distribution through retail fulfillment centers in connection with special advertisements on radio or television, the method known as direct mail or mail order, or by any combination of the methods set forth above, URI shall credit UMF's royalty account with a sum equal to fifty percent (50%) of URI's net royalty receipts from such sales, multiplied by the Fraction.

      (ii)     For the sale of records by URI which include Masters subject hereto which are sold through the method known as "key outlet marketing" by distribution through retail fulfillment centers in connection with special advertisements on radio or television, the method known as direct mail or mail order, or by any combination of the methods set forth above, the royalty rate payable hereunder shall be one-half (1/2) the applicable rate provided for above.

      (l)     The royalty rate for records sold for sale in Armed Forces Post Exchanges shall be one-half (1/2) the applicable basic rate provided for above.

      (m)     The royalty rate payable hereunder for records sold as "premiums" shall be one-half (1/2) of the basic rate otherwise applicable and the dealer price for such records shall be deemed to be URI's actual sales price. URI shall be entitled to use and publish, and to license or permit others to use and publish, the names (real and professional), likenesses, and biographical material of all individuals performing on the Masters with respect to the products or services in connection with such "premium" records.

      (n)     URI shall have the right to license the Albums and Masters derived therefrom to third parties for phonograph record use and all other types of use on a flat-fee basis. URI shall credit UMF's royalty account with fifty percent (50%) of the net amount received by URI under each such license, multiplied by the Fraction.

      (o)     As to records sold at a discount to "one-stops", rack jobbers, distributors or dealers, whether or not affiliated with URI, in lieu of the records given away or furnished on a "no-charge" basis as provided for above, the applicable royalty rate otherwise payable hereunder with

Initials: _N.A. / Ph.m_

14

respect to such records shall be reduced in the proportion that said discount wholesale price bears to the usual stated wholesale price.

(p)     Intentionally Deleted.

(q)     Intentionally Deleted.

(r)     Royalties for phonograph records sold for distribution outside of the United States shall be computed in the same national currency as URI is accounted to by its licensees and as to sales made outside of the United States, shall be paid at the same rate of exchange as URI is paid, provided, however, that royalties on phonograph records sold outside the United States shall not be due and payable by URI until payment therefor has been received by URI in the United States in United States dollars, and provided further that if URI shall not receive payment in the United States or in United States dollars and shall be required to accept payment in foreign currency or in a foreign country, URI shall deposit to the credit of UMF (and at the expense of UMF) in such currency in a depository selected by UMF, payments so received applicable to royalties hereunder, and shall notify UMF promptly thereof. Deposit as aforesaid shall fulfill the obligations of URI as to phonograph record sales to which such royalty payments are applicable.

(s)     Intentionally Deleted.

(t)     With respect to records sold as mid-priced records, the royalty rate shall be two-thirds (2/3) of the applicable basic rate provided for above; no such reduction shall apply during the first 12 months of sales of the applicable Album.

(u)     With respect to records sold as budget records, the royalty rate shall be one-half (1/2) of the applicable basic rate provided for above; no such reduction shall apply during the first 18 months of sales of the applicable Album.

<u>Definitions:</u>

(a)     "Master recording" or "master" - the equivalent of a 7 inch, 45 rpm or 12 inch 33 1/3 rpm single-sided recording intended for use in the manufacture and sale of phonograph records.

(b)     (i)     "Single" - the equivalent of a 7 inch, 45 rpm, or a 12 inch, 33-1/3 rpm double sided phonograph record (in any configuration) embodying thereon two (2) masters.

(ii)     "Maxi-Single" - the equivalent of a 12 inch, 33-1/3 rpm, double sided phonograph record embodying thereon between three (3) and six (6) masters. Except as otherwise specifically set forth herein, all references to "Singles" shall be deemed to include Maxi-Singles.

(iii)     "EP" - A record embodying thereon between five (5) and eight (8) masters, provided, however, that in the event that more than one (1) of such masters embody the same musical composition, such record shall be deemed to be a Maxi-Single.

(iv) "LP" or "Album" - the equivalent of a 12 inch, 33-1/3 rpm, double sided long playing phonograph record embodying thereon the equivalent of not less than ten (10) masters nor less than thirty-five (35) minutes in duration.

(c)     "Records", "phonograph records", "recordings", and "derivatives" means and includes all forms of sound-only recording and reproductions, now known or which may hereafter

Initials: _____

15

become known, which are manufactured or which are digitally or otherwise electronically transmitted or downloaded, and which are sold primarily for ultimate consumer and/or jukebox-type use and/or use on or in means of transportation, including, without limiting the generality of the foregoing, any and all media or devices for the reproduction of artistic performances.

      (d)    "Dealer price" " means the price charged to retail accounts by URI or its distributor in, at URI's election, the country of sale or manufacture (exclusive of all taxes, discounts and duties).

      (e)    "Net royalty receipts" shall mean royalties which are specifically paid to URI by URI's licensees and which are received by URI or credited to URI's account against an advance previously received in the United States in respect of Masters hereunder, less URI's following expenses in respect of same:  costs of collection, shipping, taxes, and payments to any unions or guilds (or their trust funds).

      (f)    "Mid-priced record" means a record which bears a suggested retail list price in the applicable country of the Territory of between 65% and 85% of the suggested retail list price of Company's or Company's licensee's, as applicable, then-current newly-released top-line records in the same configuration or format.

      (g)    "Budget record" means a record which bears a suggested retail list price in the applicable country of the Territory of less than 65% of the suggested retail list price of Company's or Company's licensee's, as applicable, then-current newly-released top-line records in the same configuration or format.

      (h)    "New Technology Format" shall mean (i) digital playback formats other than compact disc (e.g., digital compact cassette and mini-disc); (ii) computer software formats (e.g., CD-Rom, CD-I, and other interactive formats); and (iii) formats designed for satellite, telephone or other electronic transmission, including but not limited to internet transmission.

Initials: _NZ. / PM_

**COMPLAINT**

**EXHIBIT 4**

# LEVINSOHN & ARNAY, LLP

ATTORNEYS AT LAW
1790 BROADWAY – 10ᵀᴴ FLOOR
NEW YORK, NEW YORK 10019-1412

TELEPHONE:   212 262 0411
FACSIMILE:   212 262 5022
jarnay@entlawfirm.com

January 4, 2010

<u>BY FEDEX</u>

Ultra Enterprises, Inc.
1000 NW 14ᵗʰ Street
Miami, FL 33136

Gentlemen:

Reference is made to the Settlement Agreement dated November 23, 2004 between Ultra Records, Inc. ("URI") and Ultra Enterprises, Inc. ("UMF"), as amended (the "Agreement"). Terms not otherwise defined herein have the meanings set forth in the Agreement.

It has come to URI's attention that UMF has promoted one or more commercial live events outside of Florida using the word "Ultra" as part of the branding of such events. As these activities were not undertaken with URI through the New Entity, the same constitute a material breach of UMF's obligations under the Agreement.

URI has attempted on several occasions to finalize the operating agreement for the New Entity and to work with UMF to build the live events business contemplated by the Agreement. UMF has been unresponsive to URI's efforts, and based on UMF's recent activities, URI suspects that UMF intends to ignore its obligations under the Agreement. URI remains ready and willing to work with UMF, but will vigorously enforce its rights if UMF continues to violate the terms of the Agreement. Please contact URI immediately to discuss this matter.

This letter is not meant to constitute an exhaustive analysis or statement of URI's factual or legal position in this matter. Nothing set forth herein or omitted herefrom is intended as, or shall be deemed to constitute, any admission against interest, or any waiver, relinquishment or limitation of any of URI's rights, claims, interests, defenses or positions, whether factual or legal, whether at law or in equity, all of the same being hereby expressly reserved.

Very truly yours,

James D. Arnay

cc:   Patrick Moxey (by email)
      Christine Jeanneret, Esq. (by email)