Sandor Frankel (SF 8642)
M. Breeze McMennamin (MM 5141)
FRANKEL & ABRAMS
230 Park Avenue, Suite 660
New York, NY 10169
(212) 661-5000

Robert B. Golden (RG 6157)
LACKENBACH SIEGEL LP
One Chase Road
Scarsdale, NY 10583
(914) 723-4394

Attorneys for Defendant Ultra Records, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ULTRA RECORDS, INC., a New York
corporation,                                             Case Nos.   10 Civ. 6370 (AKH)
                    Plaintiff,                                    10 Civ. 8179 (AKH)

     -against-

ULTRA ENTERPRISES, INC., a Florida
corporation,
                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ULTRA ENTERPRISES, INC., a Florida
corporation,
                    Plaintiff,
     -against-

ULTRA RECORDS, INC., a New York
Corporation,

                    Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF ULTRA RECORDS' MOTION IN LIMINE TO EXCLUDE THE SURVEY, REPORT AND <u>TESTIMONY OF DR. CHARLES D. COWAN</u>

# TABLE OF CONTENTS

**Page**

ARGUMENT……………………………………………………………………. 2

I.  LEGAL STANDARD WITH RESPECT TO THE ADMISSIBILITY OF
    EXPERT TESTIMONY…………………………………………………….. 2

II.  THE OVERALL DESIGN OF COWAN'S SURVEY IS
     FUNDAMENTALLY FLAWED AND THE SURVEY IS
     IRRELEVANT……………………..………………………………………… 4

    A.  COWAN FAILED TO SELECT THE APPROPRIATE UNIVERSE
        FOR A FORWARD CONFUSION SURVEY…..…..… 4

    B.  COWAN'S UNIVERSE WAS OVERINCLUSIVE..……………… 7

    C.  COWAN FAILED TO APPROXIMATE MARKET
        CONDITIONS………………………………………………………….. 9

III.  FLAWS IN SPECIFIC QUESTIONS AND COWAN'S ANALYSIS ALSO
      RENDER THE SURVEY INVALID……………………………… 13

    A.  COWAN'S "ULTRA MUSIC" QUESTIONS AND ANALYSIS
        WERE FLAWED……………………………………………...... 13

    B.  COWAN'S GOOGLE SEARCH ANALYSIS IS NOT
        ADMISSIBLE…………………………………………………... 16

    C.  COWAN'S "MAIN PROMOTER" LINE OF QUESTIONS AND
        ANALYSIS ARE ALSO FLAWED…………….....……………… 16

    D.  COWAN'S "LOGO" QUESTIONS AND ANALYSIS WERE
        FLAWED…………………………………………....…………… 22

CONCLUSION…………………………………………………………………….. 22

# TABLE OF AUTHORITIES

**Cases**

*American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660-661 (2d Cir. 1979) ..................................................................................................9, 12

*Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, Civ. No. 06-3508, 2007 WL 2914452, *4 (2d Cir. 2007) ..................................................................6

*Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253-254 (S.D.N.Y. 1999) ...............10

*Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 572 (E.D.N.Y. 1999) . 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ...........................2, 3

*Dreyfus Fund Inc. v. Royal Bank of Canada*, 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981) .. 9

*First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc.*, 2004 WL 1575396, *12 (S.D.N.Y. July 15, 2004) ..................................................................................5

*Hutchinson v. Essence Communications, Inc.*, 769 F. Supp. 541, 560 (S.D.N.Y. 1991) ....4

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .........................................................3

*Louis Vuitton Malletier v. Burlington Coat Factory*, 426 F.3d 532, 538 (2d Cir. 2005) .. 10

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007), *aff'd in part and vacated in part on other grounds, remanded by*, 454 F.3d 108 (2d Cir. 2007) ..................................................................................12, 18, 20

*Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) ..................................................................................11

*Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 323 (S.D.N.Y. 2000) ..14

*Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158 (2d Cir. 2004) ...........................16

*RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) .....................13

*Sterling Drug v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994) ....................................................5

*THOIP v. Walt Disney Co.*, 2010 WL 3219349, at *3 n.172 (S.D.N.Y. 2010)................14

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-231 (S.D.N.Y. 2010) ....................3

*Trouble v. Wet Seal*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001).................................................9

*Universal City Studios v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir. 1984).......................9

*Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990) .......8, 9

**Statutes**

Lanham Act §43(a) ...............................................................................................................21

**Other Authorities**

6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:10 ............5

6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:159 ..........4

6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:172 ........15

6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:189 ........14

6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:187 ........14

**Rules**

Federal Rules of Evidence, Rules 403 and 702 ....................................................................2

Federal Rules of Civil Procedure, Rule 26 ..........................................................................2

Pursuant to Fed.R.Civ.P. 26, Fed. R. Evid. 403 and 702, and the holdings of

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny,

Ultra Records, Inc. ("Ultra") hereby moves to exclude the survey, report and testimony of

Charles D. Cowan ("Cowan"), an expert designated by Ultra Enterprises, Inc.

("Enterprises") to testify on the issue of whether there is a likelihood of confusion

between the parties' respective trademarks and logos.  Cowan's report and survey are

attached as Exhibits 1 and 2.  As detailed below and in the accompanying Report of Hal

Poret (Exhibit 3), an expert witness designated by Ultra, the design and implementation

of the Cowan survey are so fundamentally flawed and so divorced from accepted

standards that the survey, related report and proposed testimony must be excluded.

## ARGUMENT

I.    **LEGAL STANDARD WITH RESPECT TO THE ADMISSIBILITY OF EXPERT TESTIMONY**

Rule 702 of the Federal Rules of Evidence states the following requirements for

the admission of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education,[1] may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[1] Although Ultra does not challenge Cowan's credentials in the field of statistical research and design, it does challenge his credentials with respect to designing and conducting likelihood of confusion surveys for trademark matters.  Unlike most trademark survey experts used in trademark disputes (including Ultra's expert), Cowan has apparently never written or spoken on the subject of trademark surveys and is not a member of any trademark-related organizations.  Despite 30 years experience, employment by the federal government, universities and the private sector, by his own admission he has designed and conducted "several" consumer surveys in trademark matters.  Cowan Report, p. 4.  His lack of relevant experience is evidenced by the numerous, fundamental design flaws in his survey, as discussed below.

Under *Daubert* and its progeny, the district court must determine whether the proposed expert testimony "both rests on a reliable foundation and is relevant to the task at hand," and the district court must act as "a gatekeeper to exclude invalid and unreliable expert testimony." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999).

In the context of surveys, including surveys in trademark cases:

> To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from that universe; (2) the survey's methodology and execution were in accordance with generally accepted standards of objective procedure and statistics in the field of such surveys; (3) the questions were leading or suggestive; (4) the data gathered were accurately reported; and (5) persons conducting the survey were recognized experts.  .  .  .    While errors in survey methodology usually go to weight of the evidence, a survey should be excluded under Rule 702 when it is invalid or unreliable, and/or under Rule 403 when it is likely to be insufficiently probative, unfairly prejudicial, misleading, confusing, or a waste of time.  Where, as here, a trademark action contemplates a jury trial rather than a bench trial, the court should scrutinize survey evidence with particular care.

*THOIP v. Walt Disney Co.*, 690 F. Supp. 2d 218, 230-231 (S.D.N.Y. 2010).

As demonstrated below, the Cowan survey wholly failed to meet these standards, and its substantial flaws render both the survey and its results invalid and unreliable, such that the survey and all related reports and testimony must be excluded.  Each of the survey's three main points of analysis also contains multiple, fundamental errors, providing additional bases for excluding the survey in its entirety.

II.    **THE OVERALL DESIGN OF COWAN'S SURVEY IS FUNDAMENTALLY FLAWED AND THE SURVEY IS IRRELEVANT**

The survey universe was inappropriate[2] and the survey failed to approximate real market conditions -- errors that are so pervasive and fundamental that they render the entire survey inadmissible.

A.    **COWAN FAILED TO SELECT THE APPROPRIATE UNIVERSE FOR A FORWARD CONFUSION SURVEY**

The universe of respondents in Cowan's survey was completely irrelevant to the question of likelihood of confusion in this case. As explained in his report, Cowan used a series of screening questions to determine "if the respondent was a customer or potential customer for *the Ultra Music Festival*, either in terms of attending the festival or possibly purchasing goods related to the Ultra Music Festival, like t-shirts." Cowan Report, ¶ 37. But this is completely the wrong group of people to be assessing. To have any relevance to the question of consumer confusion, Cowan should have surveyed potential customers of *Ultra's products*. This is a fundamental flaw in Cowan's methodology.

In a traditional "forward" confusion case "the proper universe is the potential buyers for the *junior user's* goods or services." 6 Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* ("*McCarthy*") at § 32:159 (emphasis in original), *citing inter alia Hutchinson v. Essence Communications, Inc.,* 769 F. Supp. 541, 560 (S.D.N.Y. 1991) ("It is well-settled in this circuit that the universe of the survey must include potential purchasers of the junior user's product. The Second Circuit has long adhered to the principle that 'to be probative and meaningful . . . surveys must rely upon

---

[2]  A more detailed analysis of Cowan's selection of the improper universe can be found in the Poret report at IA. – IC., pp. 11 - 16.

potential consumers of the products in question.'"); *Sterling Drug v. Bayer AG*, 14 F.3d 733 (2d Cir. 1994). In other words, the only way to prove if consumers of ULTRA's products are confused about an affiliation with Enterprises is to survey past and potential consumers of ULTRA's products.

Cowan states that in determining the universe, he "asked about the target market for the goods and services provided by [Enterprises]." Cowan Report, ¶ 19. Cowan offers further explanation about targeting potential customers of Enterprises at Paragraphs 20 and 21 of his Report, detailing his review of marketing and news items relating to the Ultra Music Festival and his review of the Ultra Music Festival web site. As Cowan explained, these screening questions were used to determine "if the respondent was a customer or potential customer for *the Ultra Music Festival* ... ." Cowan Report, ¶ 37.

What Cowan attempted to do—surveying potential customers of Enterprises—is improper for a forward-confusion case, although it is something that might be done in a "reverse confusion" case. Reverse confusion occurs when "the [second or] junior user's advertising and promotion so swamps the [first or] senior user's reputation in the market that consumers are likely to be confused into thinking that the senior user's goods are those of the junior user." *McCarthy* at § 23:10. For this to take place, (1) it must be "more likely that consumers will first encounter the junior user's—rather than the senior user's—goods," *First Nat'l Bank of Omaha, Inc. v. Mastercard Int'l Inc.*, 2004 WL 1575396, *12 (S.D.N.Y. July 15, 2004), and (2) the junior user must "swamp" or be likely to swamp, the senior user, typically by saturating the market with the allegedly infringing mark. *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, Civ.

5

No. 06-3508, 2007 WL 2914452, *4 (2d Cir. 2007).  Inherent to the reverse confusion argument is that the senior user's mark is relatively weak as compared to the junior user's mark.

Although this case has been pending since 2010, and the parties' underlying conflict for significantly longer, Enterprises has never characterized its case as one of "reverse confusion" or otherwise mentioned the concept.    Thus, the use of a universe that would measure reverse confusion was improper and invalidates the entire survey from the very outset.

Moreover, this improper universe is also in direct contrast to the representations made by Enterprises' counsel at the court conference where they first raised the issue of expert discovery.  Upon inquiry from the Court as to the universe of people Enterprises intended to survey, counsel represented that Enterprises had identified one or more databases of relevant electronic dance music consumers (*i.e.*, potential consumers of Ultra's products).  Indeed, the Court went so far as to suggest that Enterprises' counsel communicate with Ultra's counsel regarding the proper survey universe, so as to avoid potential issues.  Without explanation, Cowan did not use the data base(s) that had been identified by Enterprises' counsel.  In fact, Cowan went so far as to say that "there was no way to pre-define the population of consumers interested in electronic music," in direct contrast to counsel's representations.

In selecting a universe comprising potential consumers of ***Enterprises'*** products and services—and not ULTRA's—Cowan used an improper universe.  These respondents' perceptions—assuming that Cowan had accurately measure them (which he did not)—are not at all relevant to the question of confusion in this case.

### B.    COWAN'S UNIVERSE WAS OVERINLCUSIVE

Even presuming that Cowan actually intended to survey prospective Enterprises'

customers for the existence of reverse confusion (an issue that is irrelevant to Enterprises'

claims as pleaded), the survey universe, and the survey itself, are still invalid because he

completely failed to capture these people in his survey sample. Cowan conducted an

Internet-based survey and started with a general population of potential survey

participants. The only initial "qualification" was that the potential participants were

listed in a database "of over eight million consumers maintained by Decision Analyst, a

survey company specializing in Internet surveys." Cowan Report, ¶ 26.

Cowan then used a series of screening questions in an attempt to capture a sample

that matched his intended survey universe. Rather than limiting the population to

consumers who had attended or planned to attend a dance music festival (reverse

confusion), or consumers who had purchased or planned to purchase Ultra's electronic

dance music products (forward confusion), Cowan's screening questions asked if the

potential participants were "familiar" with any of the recording artists from a provided

list. If the respondents were familiar with any of a selected subset of the artists, they

were asked if they "liked" the artists. If they indicated they "liked" any of the artists,

they were deemed qualified. Cowan, ¶¶ 22 – 25.

More particularly, to qualify for the survey, respondents had to "somewhat like"

and be "somewhat familiar" with one or more artists from a predetermined list.

However, simply because someone is "somewhat familiar" with and "somewhat likes" a

recording artist, does not mean that someone has attended or plans to attend the Ultra

Music Festival. This is not conjecture; the Cowan survey results themselves confirm this.

After being accepted into the survey universe, respondents were asked if they had been to *any* music festival in the past five years. Fifty-four percent (54%) said they had not been to *any* music festival. An additional forty-four percent (44%) of respondents had attended a music festival but did not name an electronic music festival when asked which festival they had attended. ***Only 1.7% of the respondents had attended a music festival and named an electronic music festival.***[3] Accordingly, 98% of the respondents who took the survey (394 out of 401 respondents) gave *no* indication that they had attended any electronic music festival in the last five years. Indeed, only 8 respondents (out of 401) indicated any awareness of the Ultra Music Festival when asked to name festivals they had attended or were aware of. Thus, there is no basis to conclude that the survey accurately targeted the intended (although improper) universe of prospective attendees of the Ultra Music Festival.

Under similar circumstances, courts have held that the selected universe is inappropriate. For example, in *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259 (S.D.N.Y. 1990), a case involving Weight Watchers brand frozen entrees, one of the surveys was criticized because it "did not limit the universe to consumers who had purchased a diet frozen entree, or who had tried to lose weight through diet as opposed to exercise; therefore, some of the respondents may not have been in the market for diet food of any kind, and the study universe therefore was too broad." Cowan's universe similarly failed to limit the universe to consumers who may actually "be in the market" to attend the Ultra Music Festival. The *Weight Watchers* court held that "[f]laws in a

---

[3] There were other respondents who named music festivals that include electronic music artists amongst a wide variety of genres, such as Lollapalooza, Bonnaroo, and Coachella. However, attendance at a general music festival that covers many genres of music in no way qualifies respondents as a prospective attendee of a festival that is entirely focused on electronic music.

study's universe quite seriously undermine the probative value of the study, because to 'be probative and meaningful . . . . surveys . . . . must rely upon responses by potential consumers of the products in question.'"  *Id.*, citations omitted; *THOIP,* 690 F. Supp. 2d at 230-231 (selection and examination of a proper universe is essential to a valid and reliable survey).

In *Trouble v. Wet Seal*, 179 F. Supp. 2d 291 (S.D.N.Y. 2001), the court excluded a proposed survey based on similar flaws in the selection of the universe, among other defects.  As the court explained, "[t]o be probative and meaningful, a survey must rely upon responses from all potential consumers of the product in question." *Id. citing, Universal City Studios v. Nintendo Co.,* 746 F.2d 112, 118 (2d Cir. 1984) (*citing Dreyfus Fund Inc. v. Royal Bank of Canada,* 525 F. Supp. 1108, 1116 (S.D.N.Y. 1981); *American Footwear Corp. v. General Footwear Co. Ltd.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (universe improper because although survey participants may have once purchased hiking boots, it does not follow that they were presently interested in purchasing hiking boots); *Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 572 (E.D.N.Y. 1999) (criticizing survey for not distinguishing "between past users who intend to purchase sugar-substitutes in the future and those who do not").

### C.    COWAN FAILED TO APPROXIMATE MARKET CONDITIONS

"Although no survey can construct a perfect replica of 'real world' buying patterns, a survey must use a stimulus that, at a minimum, tests for confusion by roughly simulating marketplace conditions." *Trouble*, 179 F.Supp.2d at 308 (S.D.N.Y. 2001). "The failure of a survey to approximate actual marketplace conditions can provide

grounds for inadmissibility." *THOIP*, 690 F. Supp. 2d at 231. Here, Cowan made no effort whatsoever to replicate marketplace conditions.

Cowan's questionnaire asked the respondents three groups of questions. *First*, Cowan asked if the respondents were "familiar with the phrase Ultra Music" and if so, to describe what they know about Ultra Music (the "Ultra Music Questions"). Cowan Report, ¶¶ 43–46 and questions 8–9. *Second*, Cowan asked the respondents if they "have heard of the Ultra Music Festival": if they knew who the main promoter of the Ultra Music Festival was; and, if they believed the Ultra Music Festival was "affiliated, connected or associated" with one of four rotating options and if so, why (the "Main Promoter Questions"). Cowan Report ¶¶ 49–54 and questions 10–13. *Finally*, respondents were shown three logos (one from each of ULTRA and Enterprises, and one from a non-party, Armada Music) and questioned as to affiliation, connection or association (the "Logo Questions). Cowan Report, ¶¶ 55–62 and questions 17 (sic) and 14.

As the Second Circuit has stated, the "Lanham Act requires a court to analyze the similarity of the products in light of the way in which the marks **are actually displayed in their purchasing context**." *Louis Vuitton Malletier v. Burlington Coat Factory*, 426 F.3d 532, 538 (2d Cir. 2005) (emphasis added). Thus, "[t]o have substantial probative value, a survey . . . must also be designed to examine the impression presented to the consumer by the accused product" and "must use the proper stimulus, one that tests for confusion by replicating marketplace conditions." *Conopco, Inc. v. Cosmair, Inc.*, 49 F. Supp. 2d 242, 253-254 (S.D.N.Y. 1999).

Remarkably, in his deposition, Cowan essentially admitted that he made no effort to replicate marketplace conditions and that in his opinion, trademark surveys need not use stimuli that replicate marketplace conditions.[4] Thus, not surprisingly, in Cowan's survey, all three groups of questions fail to replicate market conditions. *First*, the Ultra Music Questions and the Main Promoter Questions merely asked about the words "Ultra Music" in the abstract, detached from any actual use by either Ultra or Enterprises on any product or service. "Ultra Music" was never presented in a font or logo in the manner in which the term is actually used. Nor was "Ultra Music" presented in connection with any product or actual advertisement. This is an improper way of presenting a stimulus for a trademark confusion survey because it does not reflect market conditions. *Nat'l Distillers Prods. Co., LLC v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 484 (S.D.N.Y. 2002) ("there were other methodological errors that prevented [the survey] from replicating actual market conditions. First, the respondents were shown the Teton Glacier label on a card, rather on a bottle, as they would encounter the label in the marketplace.").

As for the Logo Questions, although they used actual logos, they still suffered from critical defects. The three logos were shown in black and white, which is not the way they normally appear in the marketplace. Moreover, the three logos were shown side by side by side in an array, when in reality, the three logos would never appear that way. Indeed, Dr. Cowan did not cite, and Enterprises has never offered, a single example of all three logos being encountered simultaneously by any consumer. In fact, there is nothing to suggest that consumers would *ever* encounter two of the logos side by side in any actual marketplace conditions. Moreover, the logos were shown in a vacuum, not in

---

[4] Due to various scheduling issues, the Cowan deposition was not taken until July 10th and thus, the transcript is not yet available as of this date of this motion.

the context they would appear to the consumer—on a product or in an advertisement or promotion.

Under similar circumstances, surveys employing such inaccurate stimuli are routinely excluded. For example, in *THOIP,* the district court excluded THOIP's expert survey:

> When ascertaining whether a survey methodology sufficiently simulates marketplace conditions, the focal point must be the specific products tested by the survey. THOIP has not shown a reasonable likelihood that consumers would have proximately encountered the specific pairs of shirts tested by Dr. Ford [THOIP's expert]. Of crucial importance, Dr. Ford coupled THOIP and Disney shirts based on resemblance rather than on whether they were found together in the marketplace. While comparing the most similar THOIP and Disney shirts may be a useful heuristic device, a legally-probative estimation of consumer confusion must be tethered to marketplace conditions.

*THOIP,* 690 F. Supp. 2d at 236-237 (Scheindlin, J.).

Here, Enterprises cannot show a reasonable likelihood that the three logos will ever appear side by side by side, in black and white, and divorced from any actual product or advertisement. "A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591 (S.D.N.Y. 2007), *aff'd in part and vacated in part on other grounds, remanded by*, 454 F.3d 108 (2d Cir. 2007), *citing See American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655, 661 n. 4 (2d Cir. 1979) (survey that failed even to come close to replicating "actual marketing conditions" was properly rejected by district court). Cowan's survey suffers from this exact defect. Not only is it directed at the completely

wrong universe of respondents, it was not designed in any way to measure actual

consumer confusion in actual marketplace conditions. As a result it is fatally flawed and

wholly irrelevant, and should be excluded in its entirety.

III. **FLAWS IN SPECIFIC QUESTIONS AND COWAN'S ANALYSIS ALSO RENDER THE SURVEY INVALID**

Cowan's survey is completely irrelevant and not probative of any issue in this

case and should be excluded. Even if the Court were to overlook the grave defects

discussed above and accept the basic design of the survey and its chosen universe, the

survey is still inadmissible because it relied on improper questions, and because the

report and analysis draw incorrect conclusions from the data.

A. **COWAN'S "ULTRA MUSIC" QUESTIONS AND ANALYSIS WERE FLAWED**

Cowan asked the respondents if they were "familiar with the phrase Ultra Music"

and if so, "what do you know about Ultra Music." The vast majority of respondents

(over 80%) were *not* familiar with the phrase, further evidencing that Cowan's selection

process did not result in a proper universe. If they were really prospective attendees of

the Ultra Music Festival, more respondents would have been familiar with the phrase

"Ultra Music." In fact, only 34 of the respondents, or 8.5% of the universe, indicated that

they were familiar with the phrase "Ultra Music" and also mentioned anything about a

festival.

A confusion level of just 8.5% is generally not considered evidence supporting a

finding of confusion. As *RJR Foods, Inc. v. White Rock Corp.* indicates, this Circuit

looks to confusion rates of 15- 20% as evidence of a likelihood of confusion. 603 F.2d

1058, 1061 (2d Cir. 1979). Indeed, confusion rates under 10% evidence a *lack of*

confusion. *THOIP v. Walt Disney Co.*, 2010 WL 3219349, at *3 n.172 (S.D.N.Y. 2010) (quoting *McCarthy* at § 32:189). In an attempt to overcome this obvious shortcoming, Cowan resorts to statistical chicanery.

Instead of reporting confusion based on the total universe of 401 respondents that he himself selected, Cowan improperly calculated the alleged confusion by ignoring those respondents who were not familiar with the phrase "Ultra Music," thereby reducing the effective sample size to 77 and artificially inflating the confusion rate to 44%. Ignoring a portion of the universe unfamiliar with marks, as Cowan did, to artificially reduce the sample size and inflate the findings is improper. *Paco Sport, Ltd. v. Paco Rabanne Parfums*, 86 F. Supp. 2d 305, 323 (S.D.N.Y. 2000) (finding plaintiff's approach of limiting its universe to consumers aware of its own products was inappropriate because "even a weak brand could demonstrate a high degree of confusion because of the limited nature of the universe being surveyed."), *aff'd*, 234 F.3d 1262 (2d Cir. 2000).

Further, in his "Ultra Music" questions, Cowan failed to use any control whatsoever. A control is necessary to screen out background "noise" resulting from general confusion unrelated to the two marks at issue (*e.g.*, confusion about the question or mere guessing). Absent a control, it is impossible to determine what portion of the asserted confusion is relevant, resulting from the marks, and what confusion is irrelevant, resulting from noise. "A survey that fails to use a control may be given less weight or even excluded all together." *McCarthy* at §32:187.

Finally, the results of the question are tainted by the priming (or leading) effect of the previous questions. Immediately prior to being asked about the phrase "Ultra Music" (at questions 8–10), respondents were asked multiple questions about music festivals. In

questions 1, 2, 3, 4, 5, 6, and 7, they were asked specifically about "music festivals." They were asked if they had attended music festivals; to name music festivals they had attended; and, if they could, to name music festivals held annually in the U.S. These questions are leading. Questions 1–7 naturally biased respondents to be thinking of music festivals and could have caused them to mention festivals when subsequently asked about "Ultra Music." If, instead, respondents had been asked multiple questions about record companies and then were asked about "Ultra Music," they would have mentioned record companies. These types of leading questions impact the reliability and admissibility of surveys.

     A question may be leading not only by virtue of the language of the question itself, but based on the relative placement of the questions and the content of prior questions. "It may be improperly leading to expose the surveyed person to a desired response before asking the critical question . . . . A critical survey question may be slanted if it has been preceded by questions which lead the interviewee 'along the garden' path to the desired response." *McCarthy* at § 32:172. This is exactly what Cowan did. Cowan exposed the respondents to the desired response—Ultra Music is a music festival—by first asking them seven separate questions about music festivals. Cowan essentially admitted this defect in his survey, but explained that some defects are either unavoidable or too expensive to cure.

     Thus, Cowan's survey does not establish that anyone was confused. Ignoring the fatal flaws in the overall design, the questions merely asked about the words "Ultra Music" in the abstract, detached from any actual use by Ultra on a product or marketing

materials.  Further, the questions were leading and lacked a control, and the results were artificially inflated when they were reported.

### B.    COWAN'S GOOGLE SEARCH ANALYSIS IS NOT ADMISSIBLE

At pages 13–16, Paragraphs 47–48, Cowan attempts to use Google search results either to bolster his "Ultra Music" conclusions or as independent evidence of confusion. Regardless, the entire discussion of Google search results is not at all probative of confusion and is inadmissible.  First, the Google search results in no way indicate consumer confusion, but merely reflect the intrinsic nature of the Google search engine. *Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158 (2d Cir. 2004) ("Plaintiff makes much of the fact that the search function of the website www.drugstore.com associates 'Moist-Ones' with 'Wet Ones.' We agree with the district court, however, that 'the fact that the computer associates moist ones with Wet ones reflects little, if anything, about whether consumers are actually confused.").  When questioned at deposition, Cowan admitted that his Google search results do not prove consumer confusion.

Moreover, Cowan's discussion of Google search results is simply not the province of expert testimony.  The analysis utterly fails under the requirements of Rule 702.  His report and proposed testimony with respect to his Google search are not: (1) based upon sufficient facts or data, (2) the product of reliable principles and methods," or (3) the result of the application of the principles and methods reliably to the facts of the case. The Google search analysis should be excluded along with the rest of the report.

### C.    COWAN'S "MAIN PROMOTER" LINE OF QUESTIONS AND ANALYSIS ARE ALSO FLAWED

At Question 10 of the survey, Cowan asked if the respondents "have heard of the Ultra Music Festival."  At Question 11, the respondents were asked if they knew whether

a specific promoter "is the main promoter of the Ultra Music Festival." Cowan
apparently included these questions in an attempt to determine if respondents believed
that "Ultra Music" or "Ultra Records" were "affiliated, connected or associated with" the
"Ultra Music Festival."

As Cowan explains in his report (at ¶ 49), each respondent was asked these
questions regarding one of four possible promoters: Armada Music, Ultra Enterprises,
Ultra Music, or Ultra Records. At Question 12, the respondents were asked if the Ultra
Music Festival and one of the four possible promoters were "affiliated, connected, or
associated" with each other. If respondents answered "yes" to Question 12, they were
asked why they thought there was an affiliation, etc.

The entirety of the "Main Promoter" line of questions is incapable of producing
meaningful results. As explained above, the vast majority of respondents had never
heard of the Ultra Music Festival. As Cowan explains in Paragraph 41 of his report, only
seven respondents had attended the Ultra Music Festival, and only one additional
respondent could name the Ultra Music Festival without prompting. Even when
prompted with the name, only 74 additional respondents indicated that they had heard of
the Ultra Music Festival, for a total of 81 of 401 (or just over 20%).

Thus, approximately 80% of the respondents had never heard of the Ultra Music
Festival. Yet, Cowan nonetheless asked all of the respondents (including those who had
never heard of the Festival) if they knew who the Festival's main promoter is. The 80%
who had never heard of the Festival, however, had no basis to know the answer to this
question since they had no familiarity at all with the Festival. Though some of these
questions did contain an "I don't know option," the number of respondents choosing this

option did not match the number of respondents who answered that they had never heard of the Ultra Music Festival.  Therefore, respondents who said they had never heard of the Festival answered that they knew which company was the main promoter of the Festival -- which they could only have done by guessing.  Cowan seems to acknowledge this flaw by discussing, at Paragraph 50, those respondents who were willing to "venture a guess" as to the main promoter.  The respondents' guessing and Cowan's discussion of this dynamic evidences another serious design flaw.  Guesses are not evidence of genuine confusion, which is why surveys should be designed to reduce guessing and incorporate controls to account for guessing (such as "don't know" options).  Yet, contrary to accepted survey protocol, Cowan never instructed the respondents not to guess. *E.g., Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 568 (S.D.N.Y. 2007) (survey excluded, for among other reasons, "the failure to instruct respondents against guessing").  Notwithstanding the clear position of the law, when asked about his failure to instruct against guessing, Cowan simply denied that such an instruction was appropriate or that it is part of standard trademark survey protocol.

Furthermore, although Cowan attempted to provide a control for this question, the control used was completely inadequate.  The control that Cowan included was "Armada Records."  He explained that "Armada Music is included in the list as a benchmark against which to measure general confusion versus specific confusion about the Ultra Music choice."  Cowan Report at ¶ 49.  Courts have described the function of a control in a trademark survey as follows:

> A survey designed to estimate likelihood of confusion must include a proper control.  A control is designed to estimate the degree of background "noise" or "error" in the survey. Without a proper control, there is no benchmark for

determining whether a likelihood of confusion estimate is significant or merely reflects flaws in the survey methodology. **To fulfill its function, a control should "share[] as many characteristics with the experimental stimulus as possible, with the key exception of the characteristic whose influence is being assessed.**"

*THOIP*, 690 F. Supp. 2d at 240 (emphasis added); *see also, Louis Vuitton Malletier*, 525 F. Supp. 2d at 595 (S.D.N.Y. 2007) ("control stimulus is used in trademark surveys to 'sufficiently account for factors legally irrelevant to the requisite confusion,' such as the 'background noise,' generated by the '[b]efuddlement' that 'is part of the human condition.'")(citations omitted).

Once again, Cowan's opinion is inconsistent with accepted legal standards. In Cowan's opinion, the control should be from the same industry as the experimental group, but otherwise should not share characteristics with the experimental stimulus. Cowan's chosen control, "Armada Music," is not a suitable control. As Poret explained in his report at pages 22–23:

> Because Ultra is the senior user of "Ultra" and [Enterprises] can only possibly claim to be the senior user of "Ultra Music"—if it can claim to be the senior user of anything related to "Ultra"—any confusion could only be attributable to Ultra's use of Ultra Music if it exceeds the baseline level of confusion caused by the common use of "Ultra" (which results from [Enterprises']s adoption of "Ultra" after Ultra). To reliably assess the level of confusion specifically attributable to Ultra's use of "Ultra Music," therefore, it would be necessary to have a control that contains the word "Ultra." Only a control that also contains the word "Ultra," would reveal what percentage of respondents would make a connection between any two names with Ultra in it (even if the remainder of each name is not otherwise similar).

The selection and use of an improper control, standing alone or taken together with other flaws, may be sufficient to exclude a survey. *E.g.*, *Louis Vuitton Malletier v.*

*Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 596 (survey excluded; "while the poor choice of control is not dispositive of inadmissibility, both Rule 702 and 403 require the court to look at the cumulative effect of all of the flaws in a survey. Thus the poor choice of [a control] bag is an important factor cutting toward exclusion of the 2004 survey— especially when added to the problematic stimulus, which made no attempt to allow respondents to view the lettering on the Dooney & Bourke bag.").

Furthermore, even with accepting the survey with all of its flaws, including its totally ineffective control, Cowan's survey still fails to indicate an actionable level of confusion. Cowan reported that the respondents identified the sponsor as follows:

| Name | Percentage Answering Yes |
|------|--------------------------|
| Ultra Enterprises | 16% |
| Ultra Music | 14% |
| Armada Music | 8% |
| Ultra Records | 6% |

These percentages, however, are not the final step in considering whether any actionable level of confusion has been detected in the survey. "To obtain an estimate of the *net* likelihood of confusion, the researcher subtracts the measured confusion level in the control from the measured confusion level in the treatment version." *THOIP*, 690 F. Supp. 2d at 240 (emphasis added). As the leading commentators have explained, it is the "net" confusion which is key. *McCarthy* at 32:187, *quoting and citing* J. Jacoby, *Experimental Design and Selection of Control in Trademark and Deceptive Advertising Survey*, 92 Trademark Rptr. 890, 905 (2002). Thus, deducting the 8% noise level "established" by the Armada Records control from the confusion allegedly resulting from

the use of Ultra Music leaves net confusion of only 6%—a legally insufficient amount of confusion. [5] *E.g., THOIP*, 2010 WL 3219349, at *3 n.172 (confusion rates under 10% evidence a lack of confusion).

A further flaw in the survey, however, is that the entire "Main Promoter" section of questions, as well as the logo section, fail to test for confusion at all (except for the noise established by the control). Inherent to the entire Cowan survey is the presumption that Ultra and Enterprises are not affiliated, connected, or associated, such that responses stating that there is an affiliation, etc., necessarily evidence the respondents' confusion. But, Ultra and Enterprises *have* been affiliated in the manner relevant to trademark disputes.[6] As part of the Settlement Agreement resolving the first litigation, Ultra received a "premium sponsorship package." Thus, Ultra was an "official" sponsor of at least *six* Ultra Music Festivals. Cowan, however, never mentions this fact in his report. Thus, when respondents answered that Ultra Music is "affiliated, connected or associated" with the Ultra Music Festival, there is no way to determine if they were confused or if they were aware of the actual affiliation / sponsorship and thus answering correctly. Either Cowan was unaware of Ultra's role as a sponsor or he simply ignored this relevant fact. Whatever the case, the existence of a real affiliation/sponsorship relationship between the parties renders these questions utterly meaningless. For all of these reasons, the survey should be excluded in its entirety.

---

[5] As explained in detail in the Poret Report at pages 24 -25, the "Chi-square" test Cowan applies to these figures in an attempt to make them seem significant is inappropriate because "the 8% result for Armada [Records] that the Cowan Report uses as a baseline is not an 'expected outcome' that could reasonably be used as a baseline in a Chi Square test."

[6] For example, §43(a) of the Lanham Act seeks to prevent acts that create a likelihood of confusion as to "affiliation, connection or association" and "origin, sponsorship or approval, or association."

### D.  COWAN'S "LOGO" QUESTIONS AND ANALYSIS WERE FLAWED

The "Logo" questions suffered from many of the same flaws discussed above. More specifically, the logos failed to approximate market conditions, the control was improper[7], and the questions failed to account for the fact that Ultra was a sponsor of the Ultra Music Festival.  Coming at the very end of the survey, after respondents were previously asked numerous questions regarding affiliation, the respondents were primed to so answer, and thus the entire section must be considered improperly leading.

Moreover, even with all of these flaws, the confusion levels purportedly detected in response to these questions again was negligible, as deducting the "noise" represented by the "Armada Music" control leaves a net confusion level of only 7%:

| Name | Percentage Answering Yes |
| --- | --- |
| Ultra Enterprises | 16% |
| Ultra Music | 16% |
| Ultra Records | 11% |
| Armada Music | 9% |

### CONCLUSION

Taken individually or cumulatively, the survey flaws warrant exclusion under Rule 702 and *Daubert.*  Even if the Court ignores these flaws (and it should not), the negligible confusion results of 8% and 7% are below the level that courts have deemed actionable, and the risks inherent in using such flawed expert testimony in jury trials

---

[7] For the logo control, Cowan selected an "Armada Bookings" logo.  Cowan explained he picked this logo because it was in black and white and about the same size as the other logos, not because it shared relevant characteristics with the test stimuli.

warrant exclusion under Rule 403.  Accordingly, Ultra seeks an order excluding the

Cowan survey, together with the Cowan report and related testimony.


Dated:  July 16, 2012

**FRANKEL & ABRAMS**

Sandor Frankel (SF 8642)
M. Breeze McMennamin (MM 5141)
230 Park Avenue, Suite 660
New York, NY 10169
(212) 661-5000

**LACKENBACH SIEGEL LP**


By: _____
Robert B. Golden (RG 6157)
Lackenbach Siegel Building
One Chase Road
Scarsdale, NY  10583
(914) 723-4394

Attorneys for Defendant
Ultra Records, Inc.

## *CERTIFICATE OF SERVICE*

I hereby certify that a true and accurate copy of the enclosed **MEMORANUDM OF LAW IN SUPPORT OF ULTRA RECORDS' MOTION IN LIMINE TO EXCLUDE THE SURVEY, REPORT AND TESTIMONY OF DR. CHARLES D. COWAN** was served on Ultra Enterprises, Inc. d/b/a Ultra Music Festival, on July 16, 2012 via U.S. 1st Class Mail, addressed to counsel for Ultra Enterprises, Inc. d/b/a Ultra Music Festival as follows:

Michael Ingrassi Santucci, Esq.               M. Darren Traub, Esq.
Santucci, Priore & Long, LLP                   Steven Feldman, Esq.
200 South Andrews Avenue, Suite 100     Herrick, Feinstein LLP
Fort Lauderdale, FL 33301                       2 Park Avenue
                                                              New York, NY 10016


Dated:  Scarsdale, New York
             July 16, 2012

*Nicole Saraco*
Nicole Saraco