# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ULTRA RECORDS, INC., | |
| Plaintiff, | Case Nos.  10 Civ 6370 (AKH) |
| -against- | 10 Civ 8179 |
| ULTRA ENTERPRISES, INC., | |
| Defendant. | |
| | |
| ULTRA ENTERPRISES, INC., | |
| Plaintiff, | |
| -against- | |
| ULTRA RECORDS, INC., et. al, | |
| Defendants. | |

Expert Report of
Charles D. Cowan, Ph.D.

June 15, 2012

## Summary of Assignment and Opinion

1.  I was retained by counsel for plaintiff/defendant Ultra Enterprises, Inc. to determine whether there is a likelihood of confusion among consumers interested in electronic music between the names or terms "Ultra Music" and "Ultra Music Festival". I was also asked to consider whether there is confusion between the logos for "Ultra Music" and "Ultra Music Festival" .

2.  To determine whether confusion exists among consumers interested in electronic music, I conducted a survey to determine if consumers are confused between the names or the logos that are the subject of this litigation. Consumers were asked specific questions about associations they perceived between the names or between the logos. The survey shows severe confusion between the names presented and the logos reviewed by the consumers. This confusion is detailed in the sections following.

3.  I understand from conversations with counsel for Ultra Enterprises that there are also telephone calls and other contacts from consumers about events unrelated to the Ultra Music Festival that consumers mistakenly think are related. These communications have not been tabulated in a systematic fashion and so there is no way to use these reports to develop a statistical conclusion, but these communications are prima facie evidence of actual confusion among consumers and were the motivation for the survey that I conducted.

4.  The methodology I employed for the survey, a copy of the questionnaire, summary tabulations, and my opinions are presented in the sections that follow.

## Qualifications

5.  I am a partner with Analytic Focus LLC, a research company specializing in statistics, economics, and finance.

2

6.  I received a Bachelors Degree in Economics and a second Bachelors Degree in Economics (1972 for both) and a Masters Degree in Economics (1973) from the University of Michigan.  I received a doctorate in Mathematical Statistics (1984) from the George Washington University.

7.  I have worked for a number of universities, Federal agencies, and private sector companies during my career.  In particular, in the Federal Government, I held the position of Chief of Survey Design Branch and Assistant Division Chief for International Studies during my 12 years at the U.S. Bureau of the Census. I was the Chief Statistician for the National Center for Education Statistics, part of the Department of Education, and Chief Statistician for the Federal Deposit Insurance Corporation (FDIC).

8.  I was also the Chief Statistician for Opinion Research Corporation, the largest survey and market research firm in the United States, and Director of Quantitative Methods for Price Waterhouse, where I oversaw the operations of the Price Waterhouse Survey Research Center.

9.  I have served on various university faculties, including serving as a Visiting Scholar for the Survey Research Laboratory at the University of Illinois, adjunct professor of statistics at the George Washington University, and adjunct professor of biostatistics at the University of Alabama - Birmingham where I still hold a research position.

10. I have taught undergraduate and doctoral courses at the University level for over 25 years at these schools and have been a lecturer at Universities and Government agencies in South America, the Middle East, Africa, and China.  I teach sampling theory, research methods, and evaluation methods for surveys.

11. I have published two books co-authored with other researchers and numerous publications on survey methods and survey evaluation.  I currently serve on the Advisory Panel for the National Assessment of Educational Progress for the U.S. Department of Education and on the Advisory Panel on the Definition of Socio-Economic Status for the Educational Testing Service.

12. I have extensive experience in the design and implementation of research studies in the United States and in many other countries. I have designed some of the largest and most complex research undertakings for the Bureau of the Census, the Bureau of Labor Statistics, the Bureau of Justice Statistics, the Department of Housing and Urban Development, the Federal Housing Administration, the Centers for Disease Control, the National Institutes of Health, the Department of Defense, the Treasury Department, the Department of Education, the FDIC, the Department of Justice, and numerous state and local government agencies, as well as for private sector clients that specialize in market research.

13. As an expert witness, I have designed and conducted several consumer surveys and investigations regarding trademark and trade dress confusion, patent infringement, deceptive trade practices, antitrust violations, fair lending, fair housing, and discrimination. These surveys frequently involve embedded experiments designed to test specific hypotheses.

14. I am being compensated at the rate of $525 per hour. I am assisted by my colleagues at Analytic Focus, who are being compensated at rates between $125 and $425 per hour. My compensation is not dependent on the outcome of this case.

15. My resume, including a list of my publications, and a list of my past experience testifying are presented as Appendices to this report. A listing of documents I considered in this case is also included as an Appendix.


## Survey to Measure Consumer Confusion

16. This action involves claims involving consumer confusion between the trademarks and logos used by Ultra Enterprises Incorporated (UEI) and Ultra Records Incorporated (URI). There are also counterclaims by URI regarding the use of the term "Ultra". I will address the counterclaims in the section below on questionnaire design.

4

17. I was asked to conduct a survey to determine whether there is confusion between the terms "Ultra Music Festival" and "Ultra Music", and similarly whether there is confusion between the logos used by the two entities. The survey was designed and implemented in accordance with accepted standards for survey research used in litigation.[1]

18. I designed a survey that would address a relevant population for this inquiry, using a method appropriate for identifying the population and for contacting the respondents. The survey was administered over the Internet using a questionnaire I developed. I designed the questionnaire to elicit information about confusion between the terms listed above and between the logos. The next sections go into detail about the determination of the population, the administration of the survey, and the design of the questionnaire.

## Population

19. In a phone call with executives from UEI, I asked about the target market for the goods and services provided by UEI. I was told that attendees at the annual Ultra Music Festival, held in Miami each year, come from all 50 states and multiple other countries. In addition, there are now festivals held in other countries or planned for other countries as UEI broadens its scope outside of the U.S. There was no specific statement made by the executives about the ages of their target market nor the location where the target market was located.

20. Instead, the executives stressed that the Ultra Music Festival is open to everyone and the growing attendance from all states and many countries is an indication of the broad appeal of the Festival. Marketing and press for the Festival would indicate that this is true, since the marketing and news items published cover a broad range. Note also that the Festival is not the only product or service sold in conjunction with Ultra Music Festival's website. It also sells t-shirts and other goods on-line. Finally, an economic impact study provided to me shows a broad appeal for the Festival across ages and by geography.

---

[1] See Diamond, Shari "Reference Guide on Survey Research", in Reference Manual on Scientific Evidence, Federal Judicial Center, National Academy of Sciences Press. 2011.

21. The one restriction in the population to consider is that the Festival is for and targeted to electronic music fans. Electronic music is recognized as a collection of genres of music, though definitions of electronic music seem to vary. A list of genres considered to be electronic music is presented in Table 1.

**Table 1:  Genres of Electronic Music**

(taken from http://en.wikipedia.org/wiki/List_of_electronic_music_genres)

**Ambient**
- Ambient techno
- Dark ambient

- Drone music
- Illbient
- Isolationism
- Lowercase

**Break**
- Acid breaks
- Baltimore Club
- Big beat
- Breakbeat
- Broken beat
- Nu skool breaks

- Florida breaks
- Progressive breaks

**Disco**
- Cosmic disco
- Euro disco

- Italo disco

- Nu-disco
- Space disco

**Downtempo**
- Acid jazz
- Balearic beat
- Chill out
- Ethnic electronica

**Electroacoustic music**
- Acousmatic music
- Computer music
- Electroacoustic improvisation
- Field recording
- Live coding
- Live electronics
- Musique concrète
- Soundscape composition
- Tape music

**Electronica**
- Berlin school
- Chillwave

- Electronicore
- Electronic dance music

- Folktronica
- Freestyle music
- Laptronica
- Skweee

- Sound art

**Electronic rock**
- Alternative dance

- Dance-punk
- Dark Wave
- Coldwave
- Electroclash

- Ethereal Wave

**Hard dance**
- Dubstyle
- Hard NRG

- Hardstyle
- Jumpstyle
- Nu-NRG

**Hi-NRG**
- Eurobeat

- New beat

**House music**
- Acid house
- Chicago house
- Deep house

- Disco house
- Diva house /Handbag house

- Hardbag
- Electro swing
- Swing house
- French house

- Funky house

- Garage house
- Ghetto house

- Hard house
- Hip house
- Italo house
- Latin house
- Microhouse/Minimal house

**Jungle**
- Darkcore jungle
- Hardstep

- Hardcore jungle
- Raggacore
- Ragga-jungle

**Post-disco**
- Boogie

- Dance-pop
- Dance-rock
- K-pop

**Techno music**
- Acid techno

- Detroit techno

- Free tekno

- Ghettotech
- Hardtechno
- Minimal
- Nortec
- Progressive techno
- Rotterdam techno
- Schranz
- Symphonic techno
- Tecno brega

**Trance music**
- Acid trance

- Classic trance

6

New age music

Nu jazz
Trip hop
**Drum and bass**

Darkstep
Drumfunk
Drumstep
Intelligent drum and bass
Jump-Up
Liquid funk

Neurofunk
Sambass
Techstep
**Dub**

Afro-dub
Dubstep
Brostep

Dubtech
Dubtronica

**Electro music**

Crunk

Indietronica

New rave
New Wave
Synthpop

Synthpunk
Trip rock
**Eurodance**

Bubblegum dance
Italo dance
J-pop

**Hardcore**
4-beat
Bouncy techno
Breakcore

Digital hardcore
Doomcore
Gabber

Happy hardcore
Hardcore breaks

Makina

Speedcore

UK Hardcore

Moombahton
Progressive house/Progressive electronic dance music
Tech house
Tribal house

Vocal house
**Industrial music**
Cybergrind
Electro-Industrial
Aggrotech
Dark electro
Electronic body music
Futurepop
Industrial metal
Industrial rock
Neue Deutsche Härte
Noise
Japanoise
Power electronics
Death industrial

Power noise
Witch house/Drag
**Intelligent dance music**
Ambient house
Glitch

Dream trance

Goa trance
Hard trance
Neo-trance
Psychedelic trance
Dark psytrance
Full on

Psybient
Psybreaks
Suomisaundi

Tech trance
Uplifting trance
Vocal trance
**UK garage**

2-step garage
Breakstep
Grime

Grindie
Speed garage
Bassline/4x4 garage

UK funky
**Video game music**
Chiptune
Bitpop
Game Boy music
Nintendocore

22. To focus the survey on the target market, I set up filters within the survey to let the consumers define themselves as being in the population or not. There is no way to pre-define the population of consumers interested in electronic music before the survey is conducted or respondents are contacted. Filtering is an effective and methodologically sound device for obtaining a target population that is a subset of the full U.S. population.

23. The extensive list offered in Table 1 is too broad and diverse to use to determine whether a consumer is an electronic music fan.  Furthermore, there are questions about whether an electronic music fan would know about or agree with the genres offered in the list in Table 1. Instead of focusing on the list of genres, I instead focused on performers clearly identified with electronic music, particularly those who have appeared in the past at the Ultra Music Festival.

24. In the survey, after I determined that the survey respondent does not work in the music industry or advertising, I provided a list of performers of various types of music, including music that is not electronic music. I started by asking the respondent if they are familiar with any of 35 different performers or groups.  The respondent could indicate that they are extremely familiar, very familiar, or somewhat familiar with the group or artist, or that they had heard of the group or artist but were not familiar with their work, or that they had never heard of the group.

25. For every artist\group for whom the respondent indicated some degree of familiarity (extremely, very, somewhat), the respondent was then asked in a second question about whether they liked the artist.  The respondent could answer that they strongly like, somewhat like, somewhat dislike, strongly dislike, or are neutral towards each artist\group with whom they were familiar.  If the respondent indicated that they liked (strongly or somewhat) any of the 15 artists listed in Table 2 below, the respondent qualified for the survey.  It is my understanding that these artists have all appeared in the past at the Ultra Music Festival.

**Table 2:  List of Artists or Groups Used to Qualify Respondents as Customers or Potential Customers for the Ultra Music Festival**

| | | |
|---|---|---|
| Afrojack | Fatboy Slim | Skrillex |
| Armin Van Buuren | Justice | Steve Aoki |
| Benny Benassi | Kraftwerk | Swedish House Mafia |
| David Guetta | Martin Solveig | The Chemical Brothers |
| Deadmau5 | The Prodigy | Tiësto |

26. Thus, an initial sample of households was selected from a sampling frame of over eight million consumers maintained by Decision Analyst, a survey company specializing in Internet surveys for market research and other purposes.  The only restriction on the sample that I requested was that the final interviewed sample was distributed across the nine Census Divisions,

with 40 completed interviews from seven of the divisions and 60 completed interviews from the South Atlantic and the East South Central Census Divisions, the two divisions closest to Miami which is where the Ultra Music Festival is held. This distribution of the sample is not the same as the distribution of the population in the U.S. by design. This distribution allows for a determination by geographic area of the likelihood of the confusion as part of the analysis of the survey. Final results for the U.S. are obtained through weighting of the sample back to a national distribution that is proportionate to the population distribution in these divisions. This is a common technique in Census Bureau surveys where disproportionate sampling is required by law for many areas and different subpopulations.

27. From this initial sample, consumers were asked whether they were familiar with any of the artists or groups listed in Table 2. If the consumer was familiar with any of these, then the consumer qualified for the remainder of the survey.

28. As noted earlier, the sample was distributed with 40 interviews in each of seven Census Divisions, and 60 interviews in the South Atlantic and East South Central Census Divisions. This type of allocation is not unusual in surveys when there is a concern about geographic measures. For example, in the survey used by the Census Bureau to estimate the monthly unemployment rate, there is a sample of persons in every state, and the sample sizes for states are approximately equal from state to state, which facilitates making state-by-state estimates of the unemployment rate. This means that sample sizes in New York, California, and Texas are not all that different from sample sizes in Rhode Island, Connecticut, Hawaii, and Wyoming. However, when making a national estimate of the unemployment rate, estimates from individual states are "weighted" together to obtain a national estimate. The weights for this purpose are proportional to the population size in each state, so that New York, California, and Texas contribute much more to the overall average than any of the individual smaller states.

29. The same approach has been taken in this survey, with a set of weights computed to bring the distribution of contributions by Census Geographic Division in line with their populations. Using the 2010 Census, the population of persons aged 18 and older was tabulated and used to compute weights that were stored on the data file that contains the survey.

9

30. There is no available data regarding the distribution by state of attendees at the Festival. The executives at UEI indicated that attendees come from all 50 states. To factor in geographic information, I took the population distributions for states in the U.S. as the best estimate of the possible distribution of electronic music consumers. The unweighted distributions of the sample give greater weight to people who live in states closest to Miami, Florida, where the Festival is held. The weighted distributions give weight to consumers in proportion to the distribution of the population in the U.S.

31. Note also that arguments will likely be made about the choice of 18+ as opposed to 16+ or some other cut-off. The choice of 18+ was driven by expediency, since this is the way that the population totals are tabulated by the Census Bureau. However, since the application of population weights gives relative weights to the states by size (meaning it's a fixed pie - if one state's representation goes up, another state's representation must go down), the choice of 18+ gives almost identical results as the choice of 16+, so this argument is nugatory.

32. The use of weighting and the filtering of respondents to obtain those respondents who know and like one or more of the electronic music artists in the list should resolve any questions about whether the appropriate population is examined. We are guaranteed that the consumers interviewed are interested and likely purchasers of electronic music related items or likely attendees at the Festival. Weighting allows consideration of alternative geographic distributions of consumers, over and above the two offered here using proximity and proportional representation by Census Division.

## Questionnaire

33. For the consumers who qualified for the survey, they were asked a series of questions to establish knowledge and behavior before moving on to questions that would address the likelihood of confusion. In particular, the respondent was asked if they had attended any music festivals in the last five years, and if not, could they name any annual music festivals. If they had been to a music festival, the respondent was asked to name the festivals they had attended.

34. Following these questions, the respondent was asked if they were familiar with the phrase "Ultra Music", and if so, what they associated with the phrase. Until that time, there has been no mention of the Ultra Music Festival in the questionnaire. This question was posed to determine, even if the Ultra Music Festival was not named previously, whether the respondent associates the phrase "Ultra Music" with the Festival.

35. Respondents also were asked who the promoter is for the Festival and whether the Festival is affiliated, connected, or associated with particular promoters, including Ultra Enterprises, Ultra Records, Ultra Music, and Armada Music. The latter is a control to determine the level of general confusion on the part of respondents versus confusion over the terms used.

36. Finally, logos from the Ultra Music Festival, from Ultra Records, and from Armada Records were shown to the respondents to determine if respondents thought that any two or all three of the logos were for companies that were affiliated, connected, or associated with each other. The presentation of the logos was randomized to ensure that there would be no "order effects" that would affect the perception of the consumers.

## Analysis

37. A total of 401 respondents passed the screening questions to qualify for the survey and completed the survey. These 401 respondents indicated some familiarity and liking for one or more of the 15 artists used for screening to determine if the respondent was a customer or potential customer for the Ultra Music Festival, either in terms of attending the festival or possibly purchasing goods related to the Ultra Music Festival, like t-shirts.

38. Respondents were first asked, in the main questionnaire, if they had been to a music festival in the last five years. If the respondent answered "No", the respondent was asked if they could name music festivals that they were familiar with. Of all respondents, 54% answered that they had not been to a music festival in the last five years. Of these 54%, 27% answered they could not name a yearly music festival, and 73% answered that they could (158 respondents). When asked to name a music festival, none of these respondents (those who had not been to a festival) spontaneously mentioned the Ultra Music Festival.

11

39. This leaves about half of the respondents (46%) who answered that they had been to a music festival in the last 5 years. Of the 184 respondents who said they had been to a music festival in the last 5 years, only 7 reported having been to the Ultra Music Festival. When asked about other music festivals that the respondent could name, only one other respondent of the 184 named the Ultra Music Festival. Between attendance at a music festival or mentions of other festivals, there were 341 mentions of festivals by the 184 respondents who attended a festival.

40. In short, there are very few respondents who have been to the Ultra Music Festival or who spontaneously mention the Ultra Music Festival, even though these are consumers who like one or more of the artists who have appeared at the Ultra Music Festival. However, this doesn't mean that the consumers are completely unaware of the Ultra Music Festival because when prompted, more respondents recalled the name Ultra Music Festival.

41. Respondents were asked "Although you may have indicated this in an earlier question, we would like to know if you have heard of the Ultra Music Festival?". In addition to the 7 respondents who attended the Festival and the one mention of the Festival by a respondent who had not attended the Festival, 74 respondents indicated having heard of the Festival. Thus a total of 82 respondents, just over 20 percent, mentioned the Festival unaided or when prompted.

42. This indicates that there are a large number of people in the United States, nearly 80 percent, who are not familiar with the Ultra Music Festival and who should have no reason to understand directly what is meant by the phrase "Ultra Music" or who might be associated with the Festival.

## Confusion on the phrase "Ultra Music"

43. Respondents were asked the question "Are you familiar with the phrase Ultra Music?". Just under 20 percent of the sample indicated they were familiar with the phrase. If the respondent answered that they were familiar with the phrase, they were then directed to "Please describe what you know about Ultra Music". Respondents gave many different interpretations of the phrase, with many respondents giving multiple interpretations. Respondents who were not familiar with the phrase "Ultra Music" were not asked for an interpretation.

44. Of those who were familiar with the phrase "Ultra Music", 44% had one or more mentions of the Festival when describing what the respondent knew about the phrase "Ultra Music".  Only 7.8% of the respondents mentioned Ultra Records instead of some other meaning to the phrase.

45. Table 3 below presents a list of coded responses to the question about knowledge of the meaning of the phrase "Ultra Music".  To be conservative, one phrase given by three individuals "It is full of passion" that seems to be related to the Festival was not counted in the total of those mentioning the Festival because of the vagueness of the association.  Note that 62 of the 138 associations with Ultra Music are directly related to the Ultra Music Festival, or 45% of the mentions given by the 77 respondents who indicated familiarity with the phrase "Ultra Music".

46. It is clear that consumers who have familiarity with the phrase "Ultra Music" are likely to associate the phrase with the Ultra Music Festival.  The use of the phrase "Ultra Music" by URI would confuse consumers as to what the correct association or affiliation would be.

47. To further this argument, I did a simple search of the phrase "Ultra Music" in the Google Web Search Engine.  The results are schizophrenic.  The first listing in Google is the Ultra Music Festival website.  The second listing in Google is the new ultramusic.com for Ultra Records. Listings 3, 4, and 5 are for sites referring to the Ultra Music Festival, but listing 6 is the Ultra Records Facebook page.  Listing 7 is for a site referring to the Ultra Music Festival.  Listing 8 is for URI.  There clearly is no distinction for the search engine most commonly used by consumers between Ultra Music Festival and Ultra Records when the phrase "Ultra Music" is used as a search term.  A copy of this page is in Chart 1 below.

**Table 3:  What the Respondent Knows About the Phrase "Ultra Music"**

| Response About What Respondent Knows about Ultra Music | Frequency | Related to the Festival? |
|---|---|---|
| It is techno music | 3 | No |
| It is dance music | 5 | No |
| It is alternative music | 2 | No |
| It is house music | 2 | No |
| It is electronic music | 12 | No |
| It is dynamic/fast-paced/high energy | 5 | No |
| All-inclusive type of music | 5 | No |
| All other type of music mentions | 11 | No |
| Takes place in Miami, Florida | 13 | Yes |
| It is an electronic music festival | 12 | Yes |
| It is a festival/music festival | 13 | Yes |
| It is full of passion | 3 | No |
| It occurs annually/every March | 12 | Yes |
| It is outdoors | 1 | Yes |
| Different groups/artists are playing | 2 | Yes |
| It is good/the best festival | 4 | Yes |
| All other comments about the festival | 2 | Yes |
| It is a music/record label | 2 | No |
| All other comments about the company | 5 | No |
| It is good music | 2 | No |
| It is good | 3 | No |
| It is a new style of music | 3 | No |
| Miscellaneous comments about the time the festival lasts | 3 | Yes |
| All other comments about the artists | 3 | No |
| Other | 5 | No |
| Nothing | 4 | No |
| Don't know | 1 | No |
| Total | 138 | 62 |
| | | 44.9% |

48. Similarly, I attempted to use the phrase "Ultra Music" as a search term in Google News Search Engine, designed to search out news items as opposed to web pages.  The first four listings for news related to "Ultra Music" had to do with URI, with confusion regarding the name of the company being Ultra Music or Ultra Records, and the fifth was about the Festival.  It is impossible for a consumer reading these stories to clearly discern which company is which or whether there is an association between "Ultra Music" and Ultra Music Festival and Ultra Records, especially when "Ultra Music" can mean either company in a search.

14

**Chart 1:  Results of a Web Search Using the Phrase "Ultra Music"**



**Chart 2:  Results of a News Search Using the Phrase "Ultra Music"**



**Direct Association Tests**

49. All respondents were asked if they knew whether a specific promoter is the main promoter for the Ultra Music Festival. Four choices were available to be offered to the consumer respondents for promoters, and one of these four choices was selected at random for a respondent. A respondent could have been asked if Armada Music, Ultra Enterprises, Ultra Music, or Ultra Records is the main promoter for the Ultra Music Festival - note that the respondent was only asked about one of these four choices. Armada Music is included in the list as a benchmark against which to measure general confusion versus specific confusion about the Ultra Music choice.

50. Table 4 presents the outcomes of the question asking the respondent "Do you know if (Promoter) is the main promoter of the Ultra Music Festival?". Most respondents did not want to venture a guess and indicated that they don't know who the promoter is. However, two interesting things occur in this table. The first is that the respondents are more likely to choose to venture a guess when asked about Ultra Enterprises or Ultra Music than when asked about Ultra Records (19% and 14% respectively compared to 10%). The second is that for the Ultra Music choice, if the respondent did offer their opinion regarding who the promoter is, all 14 respondents making a choice said that Ultra Music is the promoter. No one said Ultra Music is not the promoter.

**Table 4: Whether {Promoter} is the Main Promoter of Ultra Music Festival**

| Promoter | Do you know if (Promoter) is the main promoter of the Ultra Music Festival? | | | |
| --- | --- | --- | --- | --- |
| | (Promoter) is the main promoter | (Promoter) is not the main promoter | I don't know | Total |
| Armada Music | 8 | 2 | 91 | 101 |
| Ultra Enterprises | 16 | 3 | 81 | 100 |
| Ultra Music | 14 | 0 | 86 | 100 |
| <u>Ultra Records</u> | <u>6</u> | <u>4</u> | <u>90</u> | <u>100</u> |
| Total | 44 | 9 | 348 | 401 |

51. A Chi-square test can be conducted between the responses for Armada Music (the benchmark) and each of the responses for Ultra Enterprises, Ultra Music, and Ultra Records. A test between Armada Music as the benchmark response and Ultra Records is not significant - the Chi-square test indicates that there is no significant difference between the two sets of responses. However, for the phrases Ultra Music and Ultra Enterprises, the Chi-Square test is significant (p = .034 and p= .004 respectively), meaning that the distribution is very different than the benchmark distribution. The phrase Ultra Enterprises is not at issue but is considered because it is Ultra Enterprises that is the main promoter for the Festival. The test for Ultra Music shows that many more people choose to offer an opinion than when the benchmark is offered and the opinion offered regarding is much more likely to be that Ultra Music is the main promoter. Note that this confusion does not surface when the phrase Ultra Records is offered to the respondent.

52. When asked a second question, "Are the Ultra Music Festival and {Promoter} affiliated, connected, or associated with each other?", we get very similar results.

**Table 5: Whether the Festival and {Promoter} are Affiliated, Connected, or Associated**

|  | Are the Ultra Music Festival and (Promoter) affiliated, connected, or associated with each other? | | | |
| --- | --- | --- | --- | --- |
| Promoter | Yes | No | I don't know | Total |
| Armada Music | 9 | 8 | 84 | 101 |
| Ultra Enterprises | 16 | 5 | 79 | 100 |
| Ultra Music | 16 | 3 | 81 | 100 |
| Ultra Records | 11 | 4 | 85 | 100 |
| Total | 52 | 20 | 329 | 401 |

53. Again, using Armada Music as the benchmark response, there is no measurable difference (not statistically significant) when I compare responses to the phrase Ultra Records with the benchmark. For Ultra Enterprises, there is a statistically significant difference (p=.025), and for Ultra Records the difference is even more significant (p=.011). Respondents are much more likely to connect (affiliate, associate) Ultra Music with the Festival than they are Ultra Records.

54. In short, every indicator from the survey shows that there is a high likelihood that many consumers are confused by the phrase "Ultra Music" regarding the affiliation with the Festival. At the same time, there is every indicator from the survey that there is little likelihood that consumers are confused by the phrase Ultra Records (relative to the background confusion measured by use of Armada Music).

**Logos**

55. As another inquiry, I also showed respondents three logos.   One is for the Ultra Music Festival.



56. The second is for Ultra Music.



57. The third was for Armada Music.



19

58. Each was presented to respondents in black and white and with approximately the same size. Sizes are approximate so as not to change the aspect ratio (width to height) so that the pictures are not distorted in any way. The three logos were all presented simultaneously and in a row to the respondents so that they could clearly see and compare the logos. The order in which the logos were presented was randomized to eliminate any order effects.

59. Respondents were asked "Are the trademarks affiliated, connected, or associated with each other?", and were offered several choices regarding association. All two-way associations (the Festival with UM, the Festival with Armada, and UM with Armada), the three-way association (all three are associated), and none (no association between the three).

60. Table 6 presents the tabulation of responses from this question. For further inquiry, I have cross-classified the results by whether the respondent was previously familiar with the Ultra Music Festival. Table 7 presents the percentage distribution of responses.

**Table 6: Trademark Affiliations**

| Are the trademarks affiliated, connected, or associated with each other? | Although you may have indicated this in an earlier question, we would like to know if you have heard of the Ultra Music Festival? | | |
|---|---|---|---|
| | Yes | No | Total |
| Ultra Music is affiliated, connected, or associated with Ultra Music Festival but not with Armada Music. | 34 | 90 | 124 |
| Ultra Music is affiliated, connected, or associated with Armada Music but not with Ultra Music Festival. | 5 | 3 | 8 |
| Ultra Music Festival is affiliated, connected, or associated with Armada Music but not with Ultra Music. | 12 | 9 | 21 |
| Ultra Music, Ultra Music Festival, and Armada Music are all affiliated, connected, or associated with each other. | 20 | 38 | 58 |
| None of these trademarks are affiliated, connected, or associated with each other. | 11 | 179 | 190 |
| Total | 82 | 319 | 401 |

20

**Table 7:  Trademark Affiliations – Percentage Distributions**

| Are the trademarks affiliated, connected, or associated with each other? | Although you may have indicated this in an earlier question, we would like to know if you have heard of the Ultra Music Festival? | | |
|---|---|---|---|
| | Yes | No | Total |
| Ultra Music is affiliated, connected, or associated with Ultra Music Festival but not with Armada Music. | 41.5% | 28.2% | 30.9% |
| Ultra Music is affiliated, connected, or associated with Armada Music but not with Ultra Music Festival. | 6.1% | 0.9% | 2.0% |
| Ultra Music Festival is affiliated, connected, or associated with Armada Music but not with Ultra Music. | 14.6% | 2.8% | 5.2% |
| Ultra Music, Ultra Music Festival, and Armada Music are all affiliated, connected, or associated with each other. | 24.4% | 11.9% | 14.5% |
| None of these trademarks are affiliated, connected, or associated with each other. | 13.4% | 56.1% | 47.4% |
| Total | 100.0% | 100.0% | 100.0% |
| **Percentages with "No Affiliation Removed"** | | | |
| Ultra Music is affiliated, connected, or associated with Ultra Music Festival but not with Armada Music. | 47.9% | 64.3% | 58.8% |
| Ultra Music is affiliated, connected, or associated with Armada Music but not with Ultra Music Festival. | 7.0% | 2.1% | 3.8% |
| Ultra Music Festival is affiliated, connected, or associated with Armada Music but not with Ultra Music. | 16.9% | 6.4% | 10.0% |
| Ultra Music, Ultra Music Festival, and Armada Music are all affiliated, connected, or associated with each other. | 28.2% | 27.1% | 27.5% |
| None of these trademarks are affiliated, connected, or associated with each other. | 0.0% | 0.0% | 0.0% |
| Total | 100.0% | 100.0% | 100.0% |

61. Even with the correct answers (no affiliation) included, it's clear that a large proportion of consumers are confused regarding whether Ultra Music is affiliated with the Ultra Music Festival.

62. In the lower half of Table 7, however, the confusion stands out quite strongly.  Among consumers who make some affiliation between two or three of the logos, the strongest affiliation is between Ultra Music and Ultra Music Festival and not with Armada Music.  This relationship is less clear for those familiar with the Ultra Music Festival, but for the majority of consumers, the 80% who are not familiar with the Ultra Music Festival, clearly the logos are confusingly similar.

## Conclusions

63. By almost any standard imaginable, as demonstrated by the survey, consumers are severely confused between the phrase "Ultra Music" and Ultra Music Festival in terms of associating the two.  Further, the logos are visually similar and cause confusion among consumers.


_____

Charles D. Cowan, Ph.D.
San Antonio, TX

**Appendix 1: Resume - Charles D. Cowan, Ph.D.**

Charles D. Cowan is Managing Partner of ANALYTIC FOCUS LLC. Dr. Cowan has 30 years of experience in statistical research and design. He consults for numerous public and private sector entities on the design, implementation, and evaluation of research and the synthesis of statistical and sampling techniques for measurement.

Dr. Cowan has designed some of the largest and most complex research programs conducted by the Federal Government, including the Post Enumeration Program conducted by the Bureau of the Census to evaluate the 1980 Decennial Census, the Economic Cash Recovery valuations conducted by the Resolution Trust Corporation in 1990-95, and many evaluation studies conducted for the Justice Department, the Department of Defense, the Department of Housing and Urban Development, and the Treasury Department. He has provided expert advice to corporations and government agencies on the incorporation of complex research designs in demographic and economic measurement problems, including:

- Development of procedures used by the Resolution Trust Corporation and the FDIC for determination of the value of all assets held by the RTC\FDIC taken from failed banks and S&Ls. Results from this research were used in quarterly reports to Congress on the loss to the American taxpayer that resulted from these failures. These estimates of anticipated recoveries on assets were also used by the RTC and FDIC for financial reporting, leading these agencies to their first clean opinions from the GAO in their annual review of agency financial statements.

- Establishment of audit and sampling methods to determine the completeness and reliability of reporting and record systems. These procedures were used to both expand and streamline bank examinations for safety and soundness and also compliance measurement for the FDIC. These sampling techniques are applied in the audit of Federal agencies concerned with regulatory review of operations and systems, and related systems for banks, regulatory agencies, and law firms;

- Application of econometric and biometric procedures for measurement of credit risk in large portfolios of loans. These models are frequently used for a variety of purposes within financial institutions, such as the pricing of loans, the management of customers long term, decision making on workouts for delinquent loans, and for establishment of economic and regulatory reserves.

- Evaluation of research conducted for the Department of Defense, for the National Institutes of Health, and for the Department of Agriculture, each in response to Congressional inquiries on the validity of published results, and also for defendants in lawsuits involving evidence proffered by plaintiffs in furtherance of their suit.

23

- Model fitting and development of projection methods to measure the likelihood of loss or errors in recording in loans held by banks or put up for auction; measurement of the likelihood of fraud and/or noncompliance in systems, including bank holding companies, trading activities for brokers, and systems for compliance with health department and judicial requirements;

- Incorporation of population demographic models with financial assessment models to predict risk for insurance companies and corporations in terms of number and value of potential claims in mass tort litigation.

- Development of procedures used by the Bureau of the Census for apportionment of population for revenue sharing purposes and the estimation of the undercount in the Decennial Census of Population and Housing. These procedures include application of capture-recapture methods to measure the size of the undercount in the decennial census, use of network sampling as an alternative measure for population size, and measurement of the reliability of data collected in the Census.

- Development of statistical methods to quantify the size of populations, including nomadic populations for the Census of Somalia, the undercount and overcount in the Census of Egypt, the number of missing children in Chicago, IL, and the number of homeless persons and families needing services in several large cities with transient populations.

Dr. Cowan teaches graduate and undergraduate courses in survey methods, statistics, and computer methods for analysis. He is the co-author of two books, one on evaluation of survey and census methods and one on econometric measures related to the welfare of the U.S. economy. He has written numerous articles on statistical methods, sampling, rare and elusive population research, and optimization techniques.

Prior to cofounding ANALYTIC FOCUS LLC, Dr. Cowan was a Director with ARPC and with Price Waterhouse, where he specialized in financial research, survey research, and audit sampling. From 1991 to 1996, Dr. Cowan was the Chief Statistician for the Resolution Trust Corporation and the Federal Deposit Insurance Corporation, where he designed research necessary to measure the loss from the Savings & Loan Crisis of the late 1980's and capitalization requirements for the RTC funds from the U.S. Treasury. Dr. Cowan also served as the Chief Statistician for the U.S. Department of Education, where he designed large-scale surveys of educational institutions to measure resource needs and availability, and for Opinion Research Corporation, where he designed predictive models of demand for automobile manufacturers, banks, and large horizontally diverse firms like GE and AT&T. Dr. Cowan worked for the U.S. Bureau of the Census, where he was the Chief of the Survey Design Branch and developed many of the techniques in use today for the evaluation of coverage in surveys and censuses.

24

**Education**

Ph.D., Mathematical Statistics, The George Washington University, 1984
M.A., Economics, The University of Michigan, 1973
B.A., English and B.A., Economics, The University of Michigan, 1972

**Professional Experience**

Co-Founder, ANALYTIC FOCUS LLC, January, 2002 to present.

Director, ARPC, November, 1999 to December, 2001.

Director, PricewaterhouseCoopers LLP, January 1997 to November, 1999.

Chief Statistician, Federal Deposit Insurance Corporation / RTC, 1991 to 1996.

Chief Statistician, Opinion Research Corporation, 1989 to 1991.

Chief Statistician, National Center for Education Statistics, US Dept. of Education, 1986 to 1989.

Bureau of the Census: Assistant Division Chief, International Statistical Programs Center, 1984 to 1986; Staff Liaison for Statistical Litigation Support, 1983 to 1984; Chief, Survey Design Branch, Statistical Methods Division, 1978 to 1983; Acting Chief, Survey Analysis and Evaluation Branch, Demographic Surveys Division, 1976 to 1978; Office of the Chief, Statistical Research Division, 1975 to 1976

Survey Research Center, Oregon State University: Manager, 1974 to 1975

Institute for Social Research, U. of Michigan: Assistant Study Director, 1972 to 1974.

**Professional Associations**

Adjunct Full Professor, Statistics, University of Alabama – Birmingham, 2002-present.
Associate Professor, Statistics, George Washington University, 1993 - 1998.
Visiting Research Professor, Survey Research Laboratory, U. of Illinois, 1983 - 1989.
Consultant, Dept. of Community Psychiatry, Johns Hopkins U., July 1985 - Dec 1987.

**Professional Societies – Memberships**

American Statistical Association  (ASA)
American Association for Public Opinion Research (AAPOR)
International Association of Assessment Officers

**Professional Societies - Positions**

President, Research Industry Coalition, 1999-2000
Council Member, Research Industry Coalition, Representative from ASA, 1995-2000
President, Washington/Baltimore Chapter of AAPOR, 1998
Program Chair, American Association for Public Opinion Research, 1991-2
Program Chair, Section on Survey Research Methods, ASA, 1989-90
Secretary-Treasurer, AAPOR, 1985-1986
Associate Secretary-Treasurer, AAPOR, 1984-1985
Editorial Board, Public Opinion Quarterly, 1980-1984
Editorial Board, Marketing Research, 1989-2000
Chair, Conference Committee, AAPOR, 1982-1989
Chair, Committee on Privacy and Confidentiality, ASA, 1980-1981

**Publications**

Strumpel, Burkhard; Cowan, Charles; Juster, F. Thomas; and Schmiedeskamp, Jay; editors, Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Duncan, Greg, and Cowan, Charles D., "Labor Market Discrimination and Nonpecuniary Work Rewards" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Curtin, Richard T. and Cowan, Charles D. "Public Attitudes Toward Fiscal Progress" in Surveys of Consumers 1972-73, Contributions to Behavioral Economics, Ann Arbor: The Institute for Social Research, 1975.

Goldfield, Edwin D.; Turner, Anthony G.; Cowan, Charles D.; Scott, John C., "Privacy and Confidentiality as Factors in Survey Response" in Public Data Use, Vol. 6, No 4, July 1978.

Cowan, Charles D., and Spoeri, Randall K., "Statistical Distance Measures and Test Site Selection: Some Considerations", Proceedings of the Computer Science and Statistics: Eleventh Annual Symposium on the Interface, 1978.

Bushery, John R., Cowan, Charles D., and Murphy, Linda R., "Experiments in Telephone-Personal Visit Surveys", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Spoeri, Randall K., and Cowan, Charles D., "On the Use of Distance Measures in Test Site Selection: A Practical Application Using Census Data", Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1978.

Cowan, Charles D.; Murphy, Linda R.; Wiener, Judy, US Bureau of the Census, "Effects of Supplemental Questions on Victimization Estimates from the National Crime Survey" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1978.

Bateman, David V.; Cowan, Charles D., US Bureau of the Census, "Plans for the 1980 Census Coverage Evaluation" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1979.

Hogan, Howard, and Cowan, Charles D., "Imputations, Response Errors, and Matching in Dual System Estimation", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Schwartz, Sidney H., Cowan, Charles D., and Sausman, Kenneth R., "Optimization in the Design of a Large-Scale State Sample", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1980.

Cowan, Charles D., "Modifications to Capture-Recapture Estimation in the Presence of Errors in the Data" presented at the meetings of the American Statistical Association, Biometrics Section, 1982 (no proceedings).

Fay, Robert; Cowan, Charles, US Bureau of the Census, "Missing Data Problems in Coverage Evaluation Studies" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1983.

Cowan, Charles D.; Fay, Robert E., "Estimates of Undercount in the 1980 Census" in Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D. "Interviews and Interviewing", The Social Science Encyclopedia, Routledge and Kegan Paul, Publishers, The Netherlands, 1984.

Wei, L. J. and Cowan, Charles D. "Selection Bias", Encyclopedia of Statistical Science, John Wiley and Sons, New York, N.Y., 1984.

Cowan, Charles D. and Malec, Donald J. "Capture-Recapture Models When Both Sources Have Clustered Observations", Journal of the American Statistical Association, June 1986, Vol. 81, # 394, pp. 347-353, and Proceedings of the American Statistical Association, Section on Survey Research Methods, 1984.

Cowan, Charles D., The Effects of Misclassification on Estimates from Capture-Recapture Studies. Unpublished doctoral dissertation, The George Washington University, September 1984.

Sudman, Seymour; Cowan, Charles D., "Questionnaire Design Activities in Government Statistics Offices" in Special Issue on Questionnaire Design, Journal of Official Statistics, Vol. 1, No. 2, 1985.

Cowan, Charles D. "Misclassification of Categorical Data", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1985.

Cowan, Charles D., Biemer, Paul P., Magnani, Robert J., and Turner, Anthony G., Evaluating Censuses of Population and Housing, Statistical Training Document, ISP-TR-5, U.S. Department of Commerce, Bureau of the Census, 1985.

Cowan, Charles D., Turner, Anthony G., and Stanecki, Karen "Design of the Somali Post Enumeration Survey (1986-1987)", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless", Proceedings of the American Statistical Association, Section on Survey Research Methods, 1986.

Cowan, Charles D. and Malec, Donald J. "Sample Allocation for a Multistage, Multilevel, Multivariate Survey", Proceedings of the Fourth Annual Research Conference (ARC IV), U.S. Bureau of the Census, 1988.

Frey, Carolin M., McMillen, Marilyn M., Cowan, Charles D., Horm, John W., and Kessler, Larry G.. "Representativeness of the Surveillance, Epidemiology, and End Results Program Data:  Recent Trends in Mortality Rates", Journal of the National Cancer Institute, Vol. 84, No. 11, June 3, 1992.

Cowan, Charles D., Breakey, William R., and Fischer, Pamela J. "The Methodology of Counting the Homeless, A Review" in Homelessness, Health, and Human Needs.  Institute of Medicine, National Academy Press, National Academy of Sciences, Washington, D.C., 1988.

Cowan, Charles D., "Standards for Statistical Surveys in the Federal Government:  Practices in the Center for Education Statistics", Proceedings of the American Statistical Association, Section on Survey Methods Research, 1988.

Sudman, Seymour, Sirken, Monroe G., and Cowan, Charles D., "Sampling Rare and Elusive Populations", Science, Vol. 240, pp. 991-996, May 20, 1988.

Cowan, Charles D., "Mall Intercepts and Clinical Trials:  The Philosophy of Inference from Different Types of Research Designs" in Marketing Research: A Magazine of Management & Applications, Vol. 1, No. 1, March 1989.

Cowan, Charles D., "Mall Intercepts:  Principles of Design for Research" in Proceedings of the Seventh Annual Advertising Research Foundation Research Quality Workshop, September 1989.

Cowan, Charles D., "Estimating Census and Survey Undercounts Through Multiple Service Contacts" in Housing Policy Debate:  Counting the Homeless: The Methodologies, Policies, and Social Significance Behind the Numbers, Volume 2, Issue 3, pp. 869-882, 1991.

Cowan, Charles D., "Ratio vs. Regression Estimators in a Large Scale Survey of S&L's" in Proceedings of the Section on Survey Research Methods, American Statistical Association, 1992.

Cowan, Charles D., "A Longitudinal Survey and Reality Check for the Value of Financial Assets" in Proceedings of Statistics Canada Symposium 92: Design and Analysis of Longitudinal Surveys, November 1992.

Cowan, Charles D., and Wittes, Janet, "Intercept Studies, Clinical Trials, and Cluster Experiments: To Whom Can We Extrapolate?" in Controlled Clinical Trials, Vol.15, pp.24-29, 1994.

Cowan, Charles D.; Klena, Mathew J., Resolution Trust Corp, "Allocation of Proceeds from Bulk Auctions to Individual Assets" in Proceedings of the American Statistical Association, Section on Business and Economic Statistics, 1995.

Cowan, Charles D., "Coverage, Sample Design, and Weighting in Three Federal Surveys" in Journal of Drug Issues, October 2001.

Cowan, Charles D., "Use of Mass Appraisals in Toxic Tort Litigation Involving Loss of Value" in Proceedings of the International Association of Assessment Officers, October 2002.

Cowan, Adrian M. and Cowan, Charles D., "Default Correlation: An Empirical Investigation of a Subprime Lender", The Journal of Banking and Finance, March 2004.

Cowan, Charles D. and Cowan, Adrian M., "A Survey Based Assessment of Financial Institution Use of Credit Scoring for Small Business Lending", SBA Report 283, Nov. 2006

Keith, Scott W., Wang, Chenxi, Fontaine, Kevin R., Cowan, Charles D. and Allison, David B., "Body Mass Index and Headache Among Women: Results From 11 Epidemiologic Datasets", Obesity, Volume 16, Issue 2 (February 2008) 16: 377-383; doi:10.1038/oby.2007.32

Cowan, Adrian M. and Cowan, Charles D., "The Dynamics of Credit Quality and Implications for the Pricing of Small Business Loans", The International Journal of Banking and Finance, 2007/08 (March) Vol. 5. Number 2:2008: 31-60

Brock, David W., Thomas, Olivia, Cowan, Charles D., Hunter, Gary R., Gaesser, Glenn A., and Allison, David B., Association between Physical Inactivity and Prevalence of Obesity in the United States, Journal of Physical Activity and Health, January, 2009

**Appendix 2:  Past Testimony and Rates**

**Financial:**

Veronica Gutierrez, Erin Walker, and William Smith v. Wells Fargo Bank, N.A..  Plaintiffs claimed that Wells Fargo instituted a reordering of debit card charges to maximize fee income from overdrafts without notifying depositors of the overdraft program or changes in the processing method.  Worked for plaintiffs.  Deposed in March, 2009.  Case ongoing.

A.D. Alberton and Mark C. Kessler v. Commonwealth Land Title Insurance Company.  Plaintiffs claimed that Commonwealth overcharged title policy purchasers by not giving discounts mandated by the State of Pennsylvania.  Worked for defendant.  Deposed in November, 2009.  Case ongoing.

MBIA v. Countrywide Home Loan et al.  Plaintiffs claimed that Countrywide and its affiliates breached representations and warranties of its underwriting standards, committed fraud and made certain misrepresentations in the securitization of its loans for sale to investor trusts, breached representations and warranties of its servicing guidelines, and violated its contractual obligations to accept loans that were put back because of the breaches of underwriting standards.  Developed sampling methods to help assess each of the claims.  Hearing on motion *in limine* in NY State Court regarding the acceptability of sampling for offering evidence in financial trials, September 2010.

In re: Countrywide Financial Corp. Mortgage Marketing and Sales Practices Litigation, Class Action.  Class action against Countrywide regarding fraudulent inducement and harm to borrowers who were given loans outside the underwriting standards established by Countrywide.  Calculated damages and offered opinion on commonality of class and predominance of issues.  Worked for plaintiffs.  Deposed in May, 2011.  Class certification denied.

**Deceptive Sales Practices:**

Executech v. Appleton Papers, circa 1998. Deposed, testified at class certification hearing. Class denied. Issue was whether Appleton Papers colluded with other manufacturers in the pricing of thermal fax paper products. Appleton had already won an antitrust case in Federal court on same issue. Conducted survey of pricing of product throughout Florida and proved that pricing of product was so discretionary at retail level that it was impossible to consider whether producer pricing had claimed impact at retail level. Case cited by Third District Court in Florida when tobacco class ruling in Florida was overturned on appeal.

Watkins et al. v. Dry Cleaners International, 2003. Not deposed, case settled before class hearing. Worked for defendant. Issue was whether DCI had properly informed customers of surcharge imposed to cover environmental costs. Plaintiffs claimed customers were confused and thought charge was improperly imposed tax. Survey conducted, damages calculated.

Fidelity Mortgage v. Seattle Times. Deceptive Trade Practices in Seattle Washington. Deposition in 2004. Worked for plaintiff. Damages calculated on lost sales because of publication of false interest rates. Case in appeals court.

Irena Medavoy v. Arnold Klein, M.D. et al.. Deceptive Sales practices case in California involving Botox, representing the cosmetics manufacturer. Worked for defendant. Deposed in 2004, case dismissed.

Armor Screen v. Storm Catcher et al. **Deceptive Sales practices** and **Patent Infringement** case in Florida involving two manufacturers and sellers of hurricane protection equipment. Worked for plaintiff. Survey conducted, damages calculated. Deposed in January, 2009. Case ongoing.

**Construction Defects:**

Silver Pines Homeowners Association et al. v. Silver Pine Builders et al. **Construction Defects** Damages case regarding the calculation of damages based on a sample of housing units inspected and resulting damages extrapolated to the full population of units built in a new subdivision. Worked for defense. Case settled – deposition, May 2007.

in re KITEC Fitting Litigation.  Construction Defects damages case regarding the calculation of damages based on use of survival models for KITEC water fittings.  Asked to rebut testimony that 95+% of all fittings would fail based on survival analysis.  Worked for defense.  Deposition, March, 2009.  Case settled.

in re WIRSBO Fitting Litigation.  Construction defects damages case regarding use brass fittings in plumbing.  Asked to testify in evidentiary hearing regarding the use of sampling to determine liability.  Worked for the plaintiffs.  Hearing, February 2012.  Case ongoing.

**Patent Infringement:**

Smith & Nephew v. Zimmer, circa 1999.  Deposed, then case settled.   Worked for defendant who admitted infringing on patent but claimed that the particular feature upon which they infringed was not important.  Product was hip replacement "cup" and "stem", and feature was machining of cup to minimize friction.  We conducted a survey of physicians to determine what features were important to the selection of a hip replacement part.   We used the survey to calculate damages; results were used in the settlement deliberations.

**Trademark Infringement:**

Quiksilver v. Brunswick, circa 1997.  Deposed, case settled. Worked for the defendant, who had started producing t-shirts under brand name Quicksilver, one of their boat lines.  The boat line could be named Quicksilver, but Quiksilver produces "surfer" clothes and were concerned about trademark confusion.  We conducted a survey to determine level of confusion and the likely damages caused.  Brunswick dropped the t-shirt line and settled.

St. Johns Knits versus St. Johns, circa 1997.  Deposed, case settled.  Small firm in California named itself St. Johns and began to produce ladies casual apparel with name of St. Johns. Worked for plaintiff, conducting survey on trademark confusion and calculating damages.

Nitro Leisure Products v. Acushnet. **Antitrust,** Trademark, and Deceptive Sales Practices filed in Florida. Deposition in 2003, settled in 2004. Worked for defendant. Issue was whether claims regarding the performance of "used and repackaged" golf balls were valid. Survey conducted, used to support damage claims. Second simultaneous suit was Acushnet v. Nitro – work used in settlement of the two simultaneously.

Community First Bank v. Community Banks. Trademark infringement. Deposition, October, 2004. Worked for Defendant. Issue was that Pennsylvania based Community Banks, a multi-state bank, opened branches in Northern Maryland. Community First Bank claimed it already had a charter in Maryland and the intrusion of Community Banks diminished the value of their name. Case resolved in favor of Defendant – dismissal on Summary Judgment.

**Trade Dress:**

Sound Board Manufacturer v. European Manufacturer. Trade dress infringement. Worked for plaintiff. Circa 1997. Issue was that European manufacturer bought a sound board from U. S. manufacturer, reverse engineered it, and sold their copy with exactly same layout and design in competition with U.S. manufacturer. Conducted survey of bands, churches, small recording studios, and other potential purchasers of mid-price sound boards. Case settled.

Guntersville Breathables v. Kappler. Trade dress infringement. Worked for plaintiff. 2004. A manufacturer of camouflage hunting clothes developed a unique camouflage design and used it for their primary line of clothes. A second manufacturer bought materials from same fabric company and produced exactly the same design for hunting clothes sold in similar outlets to the same population of hunters. Survey designed and implemented. Case settled.

VPX v. ABB. Trade dress infringement. Worked for defendant. 2006-7. A manufacturer of liquid energy drinks sold in gyms, health clubs, and big box retailers filed suit against another manufacturer of liquid energy drinks, claiming that the shape and type on the bottles of the defendant were the same as that of the plaintiffs and caused confusion among potential purchasers. Conducted surveys of potential purchasers of liquid energy drinks to determine

whether confusion exists.  Deposition in January, 2007, testimony in bench trial in January, 2007.  Decision for Defendant.


**Toxic Tort:**

Three separate **Toxic Tort** property value diminution cases filed in Florida between 1998 and the present.  All three cases were environmental contamination cases, with class actions brought against manufacturer.  Worked for defense in all three cases on class certification issues and damages calculations.  Deposed in last case, First Case class was not certified, Second case settled.  Third:  Bernice Samples, et al, v. Conoco, Inc.; Agrico Chemical Company; and Escambia Treating in the Circuit Court of the First Judicial Circuit in and for Escambia County, FL, Division:  "J", June 2002, Deposition; Case settled.


State of Oklahoma v. Tyson Foods et al.  Pollution case brought against Tyson, Cargill, and other poultry processors.  Claim made that Illinois River Watershed was polluted with field runoff from distribution of poultry litter.  Worked for the defense in review of analyses by experts for the state.  Deposed, February, 2009; Case mostly resolved as experts for the State were excluded from testifying based on a Daubert-decision.  Case on-going.


Vigililo v. Ryland Homes.  Claim of diminution of value in residential neighborhood due to discovery of unexploded ordnance in an area proximate to the neighborhood.  Analyzed methods of determining diminution and the availability of data from the analysis.  Deposed, July 2009.  Case dismissed.


**Other Antitrust:**

North Jackson Pharmacy, Inc. et al v. Express Scripts, Inc. et al.  Independent Pharmacies filed an antitrust case against Pharmacy Benefit Managers (PBMs).  Worked for plaintiffs.  Deposed in July, 2005; class certified.  Case moved to Multi-District Consolidation.

North Jackson Pharmacy, Inc. et al v. Caremark Pharmacies filed an antitrust case against Pharmacy Benefit Managers (PBMs). Worked for plaintiffs. Deposed in May, 2006; class certification pending, case moved to Multi-District Consolidation.

**Fair Labor Standards Act (FLSA):**

Gray et al. v. Dolgencorp et al. **Fair Labor Standards Act (FLSA)** case filed against Dollar General involving claims for overtime not paid for store managers. Analysis of hours worked, duties performed, activity types. Case initially resolved in Summary Judgment against plaintiffs. On appeal reestablished and awaiting trial. Deposition, July 2007.

Richter v. Dolgencorp et al. **Fair Labor Standards Act (FLSA)** class action case filed against Dollar General involving claims for overtime not paid for store managers. Rebuttal of expert report Deposition, Jan 2012.

Da-Heem Rodgers, et al. v. Averitt Express, Inc., **Fair Labor Standards Act (FLSA) class action**, case involving claims for overtime not paid for truck drivers. Analysis based on travel patterns and frequency of involvement in interstate commerce and damages calculation. Worked for plaintiffs. Case ongoing – deposition, June, 2008.

**Disparate Impact \ Discrimination:**

Apkins et al. v. Atlantic Marine – Mobile. Loss of jobs, loss of work hours, lack of promotions for population of blacks working for a manufacturer who laid off blacks first, re-hired (called back) blacks last, refused to promote, and kept overtime for only certain workers. Worked for plaintiffs. Analysis of hiring practices, lay off records, filings with Federal government, and other records to develop pattern of practice analysis. Case settled, no testimony.

Disparate impact in promotions for minority workers for a large public utility. Worked for plaintiffs. Analysis of testing and promotion procedures, development of methods to ascertain if skill tests used led to disparate treatment of minorities. Report submitted, case settled.

Stein et al v. SLG Group.  Disparate impact for minorities in availability of cemetery plots in multiple cemeteries owned by single holding company under the Fair Housing Act.  Analysis of sales of plots to individuals to ascertain whether a pattern of practice existed.  Worked for defendant.  Case settled.

HOPE v. Illinois Chinese American Residence for the Elderly.  Disparate impact for senior citizens for a public housing authority.  Worked for city housing authority – plaintiff.  Survey of senior citizens in a city to determine their attitudes and beliefs regarding different Federally sponsored senior citizen independent living facilities.  Analysis of demography of general population in the city and comparison to distributions of residents in all independent living facilities in the city.  Report and affidavit submitted.

AHF COMMUNITY DEVELOPMENT v. City of Dallas.  Disparate impact for  minorities and families under the Fair Housing Act.   Code inspections by police in the City of Dallas allegedly caused disruption and loss of fair use of housing in an affordable housing complex.  Analysis of business reasons under HUD guidelines for code inspections conducted by police and analysis of discriminatory and disparate impacts on residents.  Deposition, July 2008.  Defendant won on Summary Judgment.

Mississippi Home Builders v. City of Brandon, Mississippi.  Disparate impact for minorities and families under the Fair Housing Act.  City of Brandon was defendant and Homebuilders alleged a city ordinance would have a disparate impact on minorities.  Ordinance established a minimum for the size of new homes built in the city.  Claim is that the minimum causes prices to be too high for new homes, having a disparate impact on minorities.  Worked for defendant. Deposition, August 2008.  Testimony at Jury Trial, June, 2009.  Jury verdict for defendant.

JoeAnn McClandon v. Heathrow Land Partnership et al.  Discrimination case.  Heathrow is a developer that invoked a clause in the sales contract to repurchase land at original sale price from the plaintiff after plaintiff failed to complete building on the property within 24 months. Heathrow only invoked this clause twice, though there were over 100 instances of properties sold that didn't meet this requirement.  Heathrow used this clause against the two Black property

36

owners and against none of the White property owners.  Worked for plaintiff.  Testimony at Jury Trial, January 2010.  Jury verdict for the Plaintiff.

**Other cases:**

Castro v. Ford Motor, Inc.  **Wrongful Death** Suit filed in California.  Deposition and Testimony in 2001.  Worked for defendant.  Survey used in case regarding use of Ford Explorers by the general public.  Critiqued survey and damages calculations as rebuttal expert.  Jury found in favor of Ford.

Mullinax v. Buffalo Rock.  **Wrongful Death** Suit in Alabama.  Deposition and Testimony in 2004.  Worked for plaintiff.  Sampling of trucks from Pepsi bottling plant taken and analyzed to demonstrate that Pepsi \ Buffalo Rock drivers frequently speed, even after plaintiffs mother was killed by speeding fully loaded truck.  Results were that 70 to 80 percent of trucks were observed speeding during a three month period, and 90 percent of "roll-up" trucks were speeding during this period.  Jury found in favor of plaintiff with sizable award.

BMW Management, Inc. v. Sizzler, Inc..  **Lost value** and population estimates for population affected in a marketing case where a franchisor allowed a new franchise to be built in the "blocked area" around an already existing franchise.  Worked for plaintiff.  Case settled – deposition, January 2006.

Morgate et al. v. Mail Boxes Etc..  **Business interruption** case.  Plaintiffs owned franchises of MBE.  Plaintiffs claim that when MBE merged with UPS, UPS unfairly competed with old franchises, didn't maintain advertising, and caused clients of old MBE to be driven away.  Conducted a survey of allegedly lost clients.  Deposition, February 2009; case ongoing.

Avery vs. Southern Company.  **Wrongful Injury** Suit in Alabama. Plaintiff was injured in an accident and claimed that the Southern Company (Alabama Power) and Charter Cable knew or should have known that a hanging cable across a highway was a danger to other traffic.  Based on traffic observations of the number of times service trucks passed the accident site, computed

an estimate of the number of times that a service truck would have passed the accident site prior to the accident. Worked for the plaintiff. Deposition in April, 2011. Case ongoing.

**Rates**

| Personnel | Fees per Hour |
|---|---|
| Charles Cowan, Ph.D. Statistics and Economics | $525 |
| Adrian M. Cowan, Ph.D. Finance and Econometrics | $525 |
| Ed Reeves, Ph.D. Operations Research | $425 |
| Ira Holt, Banking and Underwriting | $425 |
| Senior Research Associate | $325 |
| Senior Programmer | $275 |
| Senior Underwriter | $195 |
| Research Associate | $225 |
| Programmer | $195 |
| Research Assistant | $125 |
| Underwriter | $115 |
| Clerical | $ 55 |

**Appendix 3:  Materials Relied On**

Amended Complaint

Answer to Amended Complaint and Amended Counterclaims

Answer to Amended Counterclaims

Ultra Music Festival Impacts, 4-30-2012

Diamond, Shari "Reference Guide on Survey Research", in <u>Reference Manual on Scientific Evidence</u>, Federal Judicial Center, National Academy of Sciences Press. 2011.

http://en.wikipedia.org/wiki/List_of_electronic_music_genres